*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SHELLEY FREDRICKSON, | ) | |
| | ) | Supreme Court No. S-15857 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-04681 CI |
| v. | ) | |
| | ) | O P I N I O N |
| FOREST J. BUTTON, | ) | |
| | ) | No. 7289 – September 14, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Allison Mendel, Mendel Colbert & Associates, Inc., Anchorage, for Appellant. Maurice N. Ellis, Law Office of Maurice N. Ellis, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Fabe and Carney, Justices, not participating.]

STOWERS, Chief Justice.
BOLGER, Justice, dissenting.

## I.    INTRODUCTION

Forest Button and Shelley Fredrickson never married, but they had one child together. Button and Fredrickson separated in September 2006. From September 2006 until January 2013 neither sought a formal custody order or a child support order. Instead, they had an informal arrangement to share their son's expenses. Button filed a

complaint for custody in January 2013. The parties participated in a settlement conference and entered into an agreement resolving all custody issues, but the parties reserved issues of prospective and retrospective child support for later resolution by the court.

The superior court found that Fredrickson was the obligor parent from September 2006 through August 2010, and calculated her child support obligation based on Alaska Civil Rule 90.3. The court then used the shared custody child support rules in Rule 90.3 to calculate the parties' respective child support obligations from September 2010 until 2013. For purposes of these calculations the court included as income $300,000 Fredrickson received from the Japanese government in connection with the death of her brother, who died in the 2011 Japanese tsunami. The court also calculated a prospective child support award. It found that from 2014 onward Fredrickson had been voluntarily unemployed, and it imputed income to her to calculate this prospective award. Following the court's orders, Button filed a motion for attorney's fees, which the court granted.

Fredrickson appeals. We hold that (1) the court's finding that the money from the Japanese government was paid out in three annual installments was clearly erroneous; (2) there is insufficient evidence to determine whether the money should be considered income for purposes of calculating a retrospective child support award; (3) the court did not err in finding that a deviation from retrospective child support calculations under Rule 90.3 was unwarranted; and (4) the court's decisions to impute income to Fredrickson and not to impute income to Button were not clearly erroneous.

## II. FACTS AND PROCEEDINGS

### A. Facts

Forest Button and Shelley Fredrickson never married, but they had one son in 2003. Button and Fredrickson lived together from November 2002 until they separated in September 2006.

From September 2006 until Button filed his complaint for child custody in January 2013 neither party sought a formal custody order. Instead, upon separation they agreed to a schedule where Fredrickson cared for their son every Saturday when she finished work until his bedtime the following Monday — at that time, Fredrickson worked as a delivery driver five days a week, beginning at 5 a.m. — and Button cared for him the rest of the week. Fredrickson also had visitation on Thursday evenings. In 2010 Fredrickson's brother volunteered to care for their son when Fredrickson was at work in the early mornings. Button and Fredrickson later agreed to a week-on/week-off schedule, beginning in the summer of 2010.

There was no child support order in effect from 2006 until 2014; the first child support order was the superior court's Order Regarding Child Support Payments, one of the orders at issue in this appeal. Before the litigation began the parties had an informal agreement to share their son's expenses, and they executed an agreement providing that neither party owed the other child support. After moving out of their shared home Fredrickson made monthly payments of $660 to Button to cover their son's expenses. Fredrickson also included their son on her medical insurance as a dependent, and she paid the co-pays related to his medical needs. Fredrickson also paid for his other activities, such as karate classes, swimming lessons, and football team expenses. In the spring of 2007 Fredrickson stopped paying Button a fixed dollar amount, but continued to pay some of their son's expenses directly.

In March 2011 Fredrickson's younger brother went missing in Japan; he had been killed in the 2011 tsunami. Fredrickson quit her delivery job when her brother went missing. She testified that she was unable to work due to her grief and depression. In early 2012 Fredrickson felt well enough to work part-time as a bartender and also became heavily involved in charity work.

Fredrickson worked as a bartender for less than a year, working one to two days per week at the beginning of the year and three to four days per week toward the end of the year. Since leaving her bartender position Fredrickson has not worked for pay, instead appearing to support herself mainly from payments issued from a family trust — the annual amount she received from this trust varied from year to year, and Fredrickson had no control over the amount or timing of the distributions — and from a $300,000 payment she received from the Japanese government in 2012 relating to her brother's death. At the time of trial Fredrickson still had approximately $200,000 of the Japanese government funds, and she planned to put the money toward a nonprofit she hoped to start "to help organizations in Japan in [her brother's] memory."

In 2012 Fredrickson also began thinking about returning to school to study nursing. She did not feel that bartending or truck driving was something she had a passion for, because her brother's death caused her to realize that she wanted to do something to make a difference. It was also difficult for her to find childcare for her son because of her hours while working in bartending and truck driving.

Since the parties' separation Button has received income from rentals, a consulting business, employment, a time share, and the sale of a duplex; he also has

received income as well as large losses from stock trading. Button's income varied greatly from year to year between 2006 and 2013.[1]

### B.    Proceedings

Button filed a complaint for custody in January 2013. The parties participated in a settlement conference in June. Button was represented by counsel during that conference but Fredrickson was not. During the conference the parties entered into an agreement resolving all custody issues. The final agreement specified that the parties would exercise joint legal custody and shared physical custody of their son, and the parties agreed to a week-on/week-off schedule. The parties also agreed to bear their own attorney's fees and costs. The court approved the settlement in November 2013.

However, Button also raised issues related to prospective and retrospective child support at the settlement conference. The parties reserved those issues for later resolution by the court. Superior Court Judge Erin B. Marston conducted a trial on the child support issues in June 2014. The court applied the guidelines set forth in Civil Rule 90.3 to determine child support obligations.

The court ultimately found that Fredrickson was the obligor parent from September 2006 through August 2010 and calculated her child support obligation based on Rule 90.3. The court then applied the shared custody child support rules in Rule 90.3, using the parties' actual income to calculate their respective child support obligations

---

[1]    For example, in 2007 Button reported about $114,000 as income from his consulting work. Then, Button lost this position and was forced to live off of his savings and a credit card, among other sources. In 2010 Button reported no employment or business income, but he did sell a duplex he owned in May of that year. In 2013 Button's income rose substantially to nearly $120,000. At the time of trial Button estimated that his income was about $125,000. However, Button also reported large losses on stock trades throughout this time period.

from September 2010 until 2013 (when the parties shared custody on a week-on/week-off schedule). The court included the $300,000 payment from the Japanese government as a part of Fredrickson's income for purposes of its child support calculations. Because of perceived difficulties tracking the exact amount and timing of the compensation payment, the court split the $300,000 payment into three annual installments. Therefore, for 2011, 2012, and 2013, the court determined that Fredrickson's income consisted of the income she reported on her taxes plus $100,000 per year for each annual installment.

The court concluded that Fredrickson owed Button approximately $76,231 in child support from September 2006 through the end of 2013. It deducted around $14,027 from this sum as a credit for the amount Fredrickson had paid toward their son's expenses between 2006 and 2013, and it also offset the total amount by the four months in 2010 for which Button owed Fredrickson child support. This left Fredrickson owing Button around $61,233 in past child support for September 2006 through 2013. Fredrickson moved for reconsideration, and Button supported Fredrickson's motion and raised additional points for reconsideration. Upon reconsideration, the court corrected several errors in its calculations, reducing the total amount Fredrickson owed Button to approximately $56,861.

With regard to future child support obligations, the court found that from 2014 onward Fredrickson had been voluntarily unemployed. Based on this finding the court imputed income to Fredrickson in the amount of approximately $57,395, an average of Fredrickson's adjusted gross income from her tax returns for 2006 through 2010. The court did not impute income to Button. Based on Button's 2014 income, the court concluded that he owed Fredrickson approximately $431 per month from January 2014 onwards.

After the court issued its child support orders, Button filed a motion for Alaska Civil Rule 82 attorney's fees. Thereafter the court entered an amended final

judgment awarding Button approximately $56,360, consisting of approximately (1) $48,963 for child support from prior years less Button's monthly obligation to Fredrickson beginning in January 2014 and (2) $7,396 in attorney's fees. Fredrickson appeals on multiple grounds.

## III.  STANDARD OF REVIEW

Whether the superior court used the correct method of calculating child support[2] and whether it applied the correct legal standard in calculating child support[3] poses questions of law we review de novo. "Whether an item qualifies as income for the purposes of Rule 90.3 is a question of law that we review de novo, adopting the rule that 'is most persuasive in light of precedent, reason and policy.' "[4]

A trial court's decision whether to impute income to a child support obligor is reviewed for abuse of discretion, and the amount of income to impute is reviewed for clear error.[5] "A finding is clearly erroneous if we are 'left with a definite and firm conviction that the trial court has made a mistake.' "[6] But "[w]hether there are sufficient

---

**2**      *Caldwell v. State*, 105 P.3d 570, 573 (Alaska 2005).

**3**      *Rosenblum v. Perales*, 303 P.3d 500, 503 (Alaska 2013) (citing *Koller v. Reft*, 71 P.3d 800, 804 (Alaska 2003)).

**4**      *Robinson v. Robinson*, 961 P.2d 1000, 1002 (Alaska 1998) (quoting *Nass v. Seaton*, 904 P.2d 412, 414 (Alaska 1995)).

**5**      *Reilly v. Northrop*, 314 P.3d 1206, 1212 (Alaska 2013).

**6**      *Heustess v. Kelley-Heustess*, 259 P.3d 462, 468 (Alaska 2011) (quoting *Inman v. Inman*, 67 P.3d 655, 658 (Alaska 2003)).

findings for informed appellate review is a question of law."[7] We "determine de novo whether an award of attorney's fees is governed by a rule or an exception to a rule."[8]

## IV. DISCUSSION

### A. The Court Made Insufficient Findings To Support Its Determination That Fredrickson's $300,000 Payment From Japan Should Be Considered Income For Purposes of Calculating Child Support.

#### 1. It was clear error to find that Fredrickson received the $300,000 in three annual installments.

The superior court found that Fredrickson received $300,000 from the Japanese government in three annual installments of $100,000 disbursed in 2011, 2012, and 2013. But the court acknowledged that the record was unclear on this point. While Button provided Fredrickson's monthly bank statements from 2011 to 2013, this did "little to dispel the confusion" because the payments from the Japanese government were not identified. Despite this confusion, the court found that the disbursement was not a one-time payment and therefore it must be calculated as spread out over several years. The court based this finding on the fact that "[n]owhere in the bank statements is a deposit for $300,000" and that at trial, "Fredrickson testified that she received money beyond what was reported in her taxes to live on from 2011-2013," which the court determined was "clearly a reference to the settlement from the Japanese government." We conclude that the court's finding of three annual installments of $100,000 was clearly erroneous for several reasons.

First, at the evidentiary hearing on child support, the only evidence presented as to the timing of the Japanese government's payment was Fredrickson's

---

[7] *Horne v. Touhakis*, 356 P.3d 280, 282 (Alaska 2015) (quoting *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008)).

[8] *Rosenblum*, 303 P.3d at 503.

uncontradicted testimony that she received $300,000 in 2012[9] from the Japanese government for her brother's death in the tsunami. Neither party specifically argued that Fredrickson received more than one payment from the Japanese government, and the court made no finding that Fredrickson was not a credible witness. Instead, the court's final order was the first time it was explicitly suggested that Fredrickson received the funds as three annual payments. While it is true that Fredrickson answered in the affirmative when opposing counsel asked Fredrickson whether she had "received other moneys from 2011 through 2013" beyond what was reported in her taxes, opposing counsel did not ask further questions to clarify what "other moneys" Fredrickson was referencing or to distinguish specific dates. Fredrickson's answer to this question is not inconsistent with receiving the entire $300,000 payment in 2012; 2012 falls within the 2011 to 2013 range. In addition, opposing counsel never asked Fredrickson to identify which deposit or deposits were Japanese funds, nor was she ever asked why there was not a $300,000 deposit on her statements. No other witnesses or evidence contradicted Fredrickson's testimony that she received $300,000 in 2012.

Second, while it is true that the trial court did not find a $300,000 deposit in the bank records Button submitted, these bank statements also fail to show any fixed, recurring deposits of $100,000 or any other amount that would suggest regular payments from the Japanese government. As Fredrickson states in her brief, "[t]he reasonable conclusion from the evidence presented is that the payment from the Japanese government was maintained in a separate account." There is evidence supporting this position. Fredrickson's bank statements submitted at trial show multiple transfers from

---

[9]    The superior court correctly noted that, contrary to her testimony, Fredrickson stated "in her closing argument . . . that she received the $300,000 in 2011." But in her closing argument, Fredrickson also argued, consistent with her testimony, that the settlement funds were "a large one-time payment."

a bank account numbered *94. As Fredrickson argues, this evidence is "consistent with all of the settlement funds being placed in an account numbered *94 and being transferred into [Fredrickson]'s checking and savings accounts as needed."

Third, if the payments were spread out over three years, Fredrickson would have had to receive payments in 2012, 2013, and 2014. But the beginning balance of account *94, which likely held the Japanese funds, was $240,142.06 in January 2014. This suggests that Fredrickson received all of the funds prior to January 2014, as the account's beginning balance is higher than the amount of two $100,000 payments, or $200,000, and she does not appear to have received a $100,000 payment into this account during 2014. It is more likely that Fredrickson received the entire Japanese payment in 2012 as she testified, placed the $300,000 in the account in 2012, and withdrew from the account between 2012 and January 2014, resulting in a balance of $240,142.06 in January 2014.

And while Button cites *McDonald v. Trihub* to argue that "[w]hen a party fails to present sufficient evidence necessary to clarify an issue, the trial court is tasked with making its determination on the best evidence that it has available,"[10] this case is easily distinguishable. In contrast to *McDonald*, in which questions were raised as to the adequacy of the evidence of a party's income before the court's decision on the matter,[11] Fredrickson would not have known that her evidence was inadequate because the argument that the funds were received in installments was never made at trial.[12] We

---

[10]     *See* 173 P.3d 416, 426 (Alaska 2007) (holding that a party "who fail[s] to present sufficient evidence to the court cannot later object on the basis of inadequate evidence").

[11]     *Id*. at 425-26.

[12]     *See also Caldwell v. State*, 105 P.3d 570, 574 (Alaska 2005) (rejecting
(continued...)

therefore conclude that it was clear error to find that Fredrickson's payment from the Japanese government occurred in $100,000 installments over three years from 2011 to 2013.

**2. The superior court made no other findings that could support a determination that Fredrickson's $300,000 payment should be considered income for purposes of child support.**

Because the superior court's finding that Fredrickson received money from the Japanese government in three installments was clearly erroneous, and because it relied on that finding to treat the money as income rather than a one-time gift, its decision to include the money as income for purposes of calculating child support is called into question. Yet the exact nature of the payment remains unknown. We note that Fredrickson has referred to the $300,000 payment both as a gift and as a settlement, though she argues that as a one-time gift the payment should not be considered income. And while Button relies in part in his briefing to this court on cases dealing with gifts, he consistently refers to the payment as settlement funds. The precise nature of the Japanese payment was not established in the superior court and remains unclear.

The dissent argues that there is sufficient evidence on the record to support a finding that the payments were a settlement, and that we should therefore affirm the court's determination that the payment should be treated as income. But the superior court never made a finding that the payment was a settlement, nor any other finding actually characterizing the payment. Rather, the court merely found that "as the money was paid out over several years, it is not a one-time gift or inheritance," and on that basis

---

[12]      (...continued)
superior court ruling that the sale of stock proceeds constituted a five-year revenue stream for the purposes of determining prospective child support in part because " [the State] first raised its proposal to characterize the sale proceeds as a five-year revenue stream at a late stage in the case," leaving no opportunity to respond).

concluded that it must be income. Rather than necessarily implying that the payment must have been a settlement, the court's reasoning could just as easily imply that it would have been inclined to treat the payment as a gift or inheritance but for its finding that the money was paid out in installments. Because we conclude it was clearly erroneous to find that the payment was made over time, the court's conclusion that the payment was therefore not a one-time gift must be disregarded. Because the superior court made no other findings that support its determination that the payment should be treated as income, that determination must be vacated. We therefore remand to the superior court to determine whether the payment was a gift, a legal settlement, or something else and recalculate its child support award accordingly.

> **3.     In the event the payment is determined on remand to be a gift, it may be included as income for purposes of child support to the extent it was treated as equivalent to other income.**

Based on the assumption that the money from the Japanese government was a gift, both parties advance arguments with respect to whether a gift should be treated as income for purposes of calculating child support. This debate will be relevant in the event the superior court on remand determines that the payment was a gift, so we address it here. Fredrickson argues that because the "funds were a one-time gift, it was error to treat [them] as income." Button argues that "the court only included the . . . funds in its *retrospective* determination of her child support obligation" and, therefore, the court did not err in including the funds in Fredrickson's income for the purposes of calculating the child support award.

The Commentary to Rule 90.3 explains that "[t]he principal amount of one-time gifts and inheritances should not be considered as income."[13] In *Nass v. Seaton*, we

---

[13]     Alaska R. Civ. P. 90.3 cmt. III(A).  More specifically, the Commentary
(continued...)

endorsed this approach because "any other approach blurs the easily administered and well-established historical distinction between gifts and earned income."[14]

However, our subsequent decision in *Crayton v. Crayton* deviated from the strict rule set out in *Nass*.[15] In *Crayton* a father brought a motion seeking reimbursement of child support from the mother.[16] The father argued that certain one-time monetary gifts the mother had received should be included in her income when determining her child support obligation for a period in which no child support order existed.[17] The superior court relied on our holding in *Nass* and rejected the father's request.[18] We reversed, distinguishing *Nass* as relating to calculating support obligations for the future.[19] Because a gift will not necessarily be repeated in the future, we reasoned that "the inclusion as income of a one-time gift or an inheritance would unfairly inflate" child support obligations "beyond the obligor's reliable future resources."[20] We concluded that this logic does not apply where the mother's "future payments [were] not at issue" and

---

[13]     (...continued)
suggests that courts should treat gifts and inheritances as capital assets when calculating a child support award. The Commentary states that "[t]he *principal amount* of one-time gifts and inheritances should not be considered as income, but *interest* from the principal amount should be considered as income and the principal amount may be considered as to whether unusual circumstances exist as provided by 90.3(c)." *Id.*

[14]     904 P.2d 412, 416 (Alaska 1995).

[15]     944 P.2d 487 (Alaska 1997).

[16]     *Id*. at 489.

[17]     *Id*.

[18]     *Id.* at 489-90.

[19]     *Id.* at 490.

[20]     *Id.*

"the superior court will determine [the mother]'s income only in retrospect."[21] Because "it [was] fair for the court to base the amount of reimbursement on the resources available to [the mother]," we remanded, directing the superior court to consider gifts in determining the mother's retrospective child support obligation.[22]

*Crayton* offered no citation to authority for the apparent holding that gifts should *always* be treated as income when making retrospective calculations,[23] and Justice Eastaugh wrote a concurring opinion taking issue with this court's analysis.[24] Justice Eastaugh reasoned that "most one-time gifts and inheritances should be considered to be capital assets. Such [funds] may represent the ability to earn income, an ability that should be taken into account, but the gifts themselves are often treated as capital assets by the donor and the recipient."[25] Thus, the touchstone of Justice Eastaugh's analysis was the treatment of the gift by the parties involved.

We are persuaded by Justice Eastaugh's approach. The Commentary to Rule 90.3 provides that the term "income" "should be interpreted broadly to include benefits which would have been available for support if the family had remained intact."[26] To that end, trial courts may include one-time gifts as income when calculating retrospective child support awards to the extent that the principal amount of the gift was

---

[21]   *Id.*

[22]   *Id.*

[23]   *Id.* at 490.

[24]   *Id.* at 490-91 (Eastaugh, J., concurring).

[25]   *Id.* at 491 (Eastaugh, J., concurring).

[26]   Alaska R. Civ. P. 90.3 cmt. III(A). Our opinion in *Crayton* mirrored this language in holding that it was "fair for the court to base the amount of reimbursement on the *resources available*." *Crayton*, 944 P.2d at 490 (emphasis added).

treated as the equivalent of income, i.e., as a resource to be used for general support and family expenses. By contrast, to the extent a gift is treated as a capital asset, with its principal kept separate and with only interest or rent derived therefrom treated as disposable income, the principal of the gift should not be included as income for child support purposes.[27] On remand, should the superior court determine that money Fredrickson received from the Japanese government was a gift, it may include those funds in the income calculation to the extent Fredrickson treated the payment as equivalent to a source of income rather than as a capital asset.

B. **Fredrickson Is Not Entitled To An Exception To Rule 90.3.**

1. **To qualify for an exception to Rule 90.3, Fredrickson must prove by clear and convincing evidence that manifest injustice would result from an application of Rule 90.3.**

Rule 90.3(c)(1) provides that a "court may vary the child support award as calculated under the other provisions of this rule for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied."[28] Fredrickson argues that the facts of her case warrant a deviation from the normal application of Rule 90.3's methodology for calculating child support for periods in which no support order was in effect. She claims that the parties' agreement to waive child support and her reliance on the agreement, difficulties in proving past expenses and

---

[27] Certain language in Justice Eastaugh's concurring opinion in *Crayton* suggests that the relevant question is whether the gift-giver intended the gift to be equivalent to income. *See Crayton*, 944 P.2d at 491 (Eastaugh, J., concurring). But looking to the intent of the gift-giver is at best an indirect and imperfect predictor of whether gifted funds were available for support. And in a case like this, where the donor was an abstract entity — a foreign sovereign government — determining the donor's intent is likely impossible. The simpler and more direct approach is to look at whether the gift was actually treated as income and as a resource available for support.

[28] Alaska R. Civ. P. 90.3(c)(1).

income, and her son's adequate care during the period are unusual circumstances that make the application of Rule 90.3's regular methodology unfair. She asserts that this unfairness is enough to avoid Rule 90.3's application through an exception to the rule she finds in its Commentary at VI(E)(1). Fredrickson argues that "[t]his section of the Commentary makes no reference to Civil Rule 90.3(c)(1)[] and exists separate from the Commentary interpreting Civil Rule 90.3(c)(1)." Therefore, Fredrickson asserts she does not need to "include proof of 'manifest injustice' by 'clear and convincing evidence' " as typically required under Rule 90.3(c)(1). We disagree.

As we explained in *Ruppe v. Ruppe*, Rule 90.3(c)(1) "permits the court to 'vary the child support award as calculated under the other provisions of this rule for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied' " and "[s]uch a variation may be particularly appropriate when the superior court is examining parents' conduct before any child support order was entered."[29] We went on to note that while "we have held 'that absent extraordinary circumstances, courts should apply the calculation methodology of Rule 90.3 to determine amounts to be reimbursed to custodial parents for support of children during periods not covered by support orders,' the commentary [at VI(E)(1)] to Rule 90.3 notes that 'in some circumstances unfairness may result from rigid [retroactive] application of the rule.' "[30]

Our articulation in *Ruppe* of the prevailing standard for deviations from Rule 90.3's regular methodology made clear that its Commentary at VI(E)(1) does not provide an independent exception to Rule 90.3's application in this context, but rather

---

[29]    358 P.3d 1284, 1291 (Alaska 2015) (quoting Alaska R. Civ. P. 90.3(c)(1)).

[30]    *Id.* (alteration in the original) (first quoting *Vachon v. Pugliese*, 931 P.2d 371, 382 (Alaska 1996); then quoting Alaska R. Civ. P. 90.3 cmt. VI(E)(1)).

is a component of the general standard governing deviations from Rule 90.3's methodology. In addition, the structure of the Commentary itself suggests that Part VI(E)(1)'s instructive language is still subject to the requirements of Rule 90.3(c). Part VI(A) of the Commentary provides information on exceptions in general. Parts VI(B)-(F), including Part VI(E) that Fredrickson relies on here, discuss more specific issues, all of which fall under the general category of exceptions to Rule 90.3. This indicates that Part VI(E) is subject to the general standard applied to the broader category of exceptions governed by Rule 90.3(c). In light of our recent case law and the structure of the Commentary to Rule 90.3, we hold that Fredrickson, like all parents seeking a variance from the application of Rule 90.3's methodology, would be entitled to a variation only "for good cause upon proof by clear and convincing evidence that manifest injustice would result if the support award were not varied."[31]

### 2. Fredrickson did not prove by clear and convincing evidence that manifest injustice would result from an application of Rule 90.3.

Fredrickson argues that the superior court should have deviated from Rule 90.3 in calculating child support for the periods prior to Button's complaint on several grounds. We conclude that none of these grounds warrant a deviation from the application of Rule 90.3's regular methodology.

Fredrickson contends that it is unfair to use Rule 90.3 calculations in this case because she relied on the parties' agreement that no support was due, and if she had known otherwise she would have kept careful track of her spending. She explains that between 2006 and 2013 the parties "made informal agreements to cover [their son's] expenses as those expenses arose" and that "[i]n August of 2007, the parties executed an agreement saying that neither party owed the other child support." Button signed the

---

[31] Alaska R. Civ. P. 90.3(c)(1).

agreement and both parties believed the agreement was fair and equitable at that time. Fredrickson argues that "the agreement between the parties that no additional support was owing is one of the unusual circumstances which makes the rigid application of Rule 90.3's calculation methodology unjust on these facts." She also offers the agreement as evidence that she had no reason to be aware of her potential liability for retrospective support obligations and that she therefore did not keep close records of her expenses related to the child.

But we made clear in *Cox v. Cox* "that an agreement between the parties as to child support is not an exceptional circumstance justifying deviations from the guidelines, where the agreement requires support less than that called for by the guidelines."[32]  *Cox* involved a prospective child support award,[33] but we have also applied similar logic to child support arrearages, holding in *Nix v. Nix* that "a child support waiver is not valid and enforceable until a court has reviewed and approved the waiver's substantive adequacy under Rule 90.3" and "a child support waiver presented after the initial dissolution proceeding will be given only prospective effect from the date of judicial approval."[34] Given these holdings, the superior court correctly ruled that the existence of the parties' child support waiver cannot by itself support a deviation from calculations of child support awards required by Rule 90.3.  In addition, the court correctly recognized that Fredrickson was aware that she owed support, as indicated by her payments to Button during this period.  These payments suggest she knew she was at least partially financially responsible for supporting their son.  The fact that

---

[32]     776 P.2d 1045, 1049 (Alaska 1989).

[33]     *Id.* at 1045-46.

[34]     855 P.2d 1332, 1334 (Alaska 1993) (emphasis omitted); *see also Rickmond v. Pluid*, 925 P.2d 251, 254-55 (Alaska 1996) (applying *Cox* to retrospective awards).

Fredrickson might have done something different in the absence of the agreement between the parties is not an extraordinary circumstance that would permit the superior court to deviate from a calculation under Rule 90.3.

Fredrickson also contends that it is unfair to use Rule 90.3 calculations in this case because she made substantial contributions to her child's expenses that she cannot prove. Fredrickson offered testimony and evidence about her actual spending during the time period at issue. She claimed that these expenses included $660 per month to Button for a time after they separated, including $400 for half the cost of the child's school; coverage of the child on her medical insurance; co-payments for medical care that insurance did not cover; and payments for karate, swimming, football, and other miscellaneous expenses. Fredrickson also testified that in the spring of 2007 she stopped paying a fixed dollar amount directly to Button and began paying certain of the child's expenses on her own, including school fees, doctor's bills, and extracurricular activities like soccer, football, and swimming. Fredrickson submitted documentation showing expenses she paid, including a partial check register for 2007 through 2009. But she was only able to document "partial" "example[s]" of what she paid on the child's behalf. She argues that the child support award should be lower because there were many expenditures she made that she could not prove.

However, the court credited Fredrickson $13,602 against her retrospective support obligation for the contributions she was able to prove.[35] The court properly

---

[35]    We held in *Young v. Williams* that when an obligor "is required by a divorce decree to pay to the plaintiff money for the support of the children and the unpaid and accrued installments become judgments in favor of the plaintiff, [the obligor] cannot, as a matter of law, claim credit on account of payments voluntarily made directly to the children." 583 P.2d 201, 203 (Alaska 1978) (quoting *Briggs v. Briggs*, 165 P.2d 772, 777 (Or. 1946)). However, we have explicitly held that "[t]he *Young* rule does not
(continued...)

based the amount it credited Fredrickson on the evidence presented, including Fredrickson's bank records and check book register. We conclude that Fredrickson's inability to prove additional claimed expenditures on her child in this context does not establish by clear and convincing evidence that manifest injustice would result if the court did not vary the retrospective child support from what was required under Rule 90.3 for the period from 2006 through 2013.

Fredrickson further argues that the evidence suggests that the child was well-supported financially and she would have paid more support if he needed it. Fredrickson contends the court's child support order "will only take support away from [her child] in the present" and that "[t]he substantial arrearage will effectively mean that the money available to [Fredrickson] to support [her child] will be greatly diminished during the half of his life he spends with her." And she asserts that a rigid application of Rule 90.3 would result in exactly the type of unfairness we have attempted to avoid — a " 'prolonged dispute' about who paid for what" in the past.[36]

Fredrickson's argument that the child support award will only take support away from their son in the present is without merit. In addition to the retrospective award, the superior court entered an award for prospective child support. Both of these awards are meant to provide for their son's needs, and the prospective award will ensure that both parents continue to provide for his needs in the future. Finally, using Rule 90.3 to calculate the retrospective child support award will definitively end the dispute about

---

[35]    (...continued)
apply where . . . no child support order exists and the parties have not independently reached a clear agreement as to custody and their respective support obligations." *Ogard v. Ogard*, 808 P.2d 815, 817 (Alaska 1991). Therefore, in this case where no child support order existed during the relevant time period, Fredrickson was appropriately credited with the expenditures she could prove.

[36]    *See Vachon v. Pugliese*, 931 P.2d 371, 381 (Alaska 1996).

past child support, not result in a "prolonged dispute" about who paid for what in the past.[37]

In order to qualify for an exception to calculating child support obligations under Rule 90.3, Fredrickson was required to prove by clear and convincing evidence that manifest injustice would result from an application of Rule 90.3. Because she failed to do so, we hold that the superior court did not err in using Rule 90.3 to calculate Fredrickson's support obligations.

## C. It Was Not Error To Impute Income To Fredrickson, Nor To Decline To Impute Income To Button.

### 1. The court did not err in imputing income to Fredrickson.

Button argued in the superior court that it "should treat . . . Fredrickson as voluntarily unemployed and . . . impute her past income" for the purposes of calculating a future child support award. The court agreed, finding that from 2014 onwards Fredrickson was voluntarily unemployed. Based on this finding, the court imputed income to Fredrickson under Rule 90.3(a)(4), which allows the court to "calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed,"[38] in an amount of $57,395.72 per year.[39]

---

[37] *See id.* ("Requiring proof of actual costs can lead to prolonged disputes when the interests of custodial parents in maximizing support may encourage deception and the interests of non-custodial parents in minimizing support may disadvantage the children.").

[38] Alaska R. Civ. P. 90.3(a)(4).

[39] This amount represented an average of Fredrickson's adjusted gross income from her tax returns for 2006 through 2010. The superior court chose to use the years from 2006 to 2010 for the purposes of calculating her imputed income because "[t]hese

(continued...)

There are two aspects to the standard for imputing income in the child support context. First, the superior court must find that the obligor is both voluntarily and unreasonably unemployed or underemployed.[40] Second, the superior court's method for calculating the obligor's actual earning capacity must be supported by adequate factual findings, "based upon the [obligor's] work history, qualifications, and job opportunities."[41] Fredrickson challenges the superior court's findings on both issues.

### a. There is sufficient evidence to support the court's express finding that Fredrickson's unemployment was voluntary, and the court's implied finding that it was unreasonable.

Fredrickson argues that the superior court made inadequate findings to support imputing income to her. Specifically, Fredrickson argues that before income can be imputed to an obligor, the obligor's unemployment or underemployment must be "unreasonable" considering the totality of the circumstances and that the trial court made insufficient findings to support a determination that she was unreasonably unemployed.

---

[39]     (...continued)
[were] the years that [Fredrickson] was working full-time" and because "[t]he years from 2011 onward are not a good indication of imputed income, as [Fredrickson]'s income [was] skewed by the money from the Japanese government."

[40]     Alaska R. Civ. P. 90.3(a)(4); *see Barlow v. Thompson*, 221 P.3d 998, 1003 (Alaska 2009).

[41]     Alaska R. Civ. P. 90.3(a)(4); *see Horne v. Touhakis*, 256 P.3d 280, 283-84 (Alaska 2015) (vacating order imputing income for lack of evidence and factual findings supporting the superior court's calculation); see also *Barlow* at 221 P.3d 998, 1003; *O'Connell v. Christenson*, 75 P.3d 1037, 1041 (Alaska 2003); *Koller v. Reft*, 71 P.3d 800, 805 (Alaska 2003).

We have held that "to be considered voluntarily unemployed, a parent must engage in voluntary conduct for the purpose of becoming or remaining unemployed."[42] In *Beaudoin v. Beaudoin* we explained that "the relevant inquiry under Civil Rule 90.3 is simply whether a parent's current situation and earnings reflect a voluntary and unreasonable decision to earn less than the parent is capable of earning."[43] We have also clarified that "[a] court may find that underemployment [or unemployment] [is] voluntary even if the obligor acted in good faith."[44] "The key inquiry is whether the lack of employment is the result of 'economic factors' or of 'purely personal choices.' "[45]

To determine the reasonableness of a parent's unemployment, the court "must look to the totality of the circumstances, including 'such factors as whether the obligor's reduced income is temporary, whether the change is the result of economic factors or of purely personal choices, the children's needs, and the parents' needs and financial abilities.' "[46] So long as the superior court's findings "encompass the totality of the relevant circumstances," it need not make specific findings on each of the reasonableness factors.[47]

---

[42]     *Bendixen v. Bendixen*, 962 P.2d 170, 172 (Alaska 1998).

[43]     24 P.3d 523, 528 (Alaska 2001).

[44]     *Robinson v. Robinson*, 961 P.2d 1000, 1004 (Alaska 1998).

[45]     *Reilly v. Northrop*, 314 P.3d 1206, 1213 (quoting *Nunley v. State, Dep't of Revenue, Child Support Enf't Div.*, 99 P.3d 7, 11 (Alaska 2004).

[46]     *Sharpe v. Sharpe*, 366 P.3d 66, 69 (Alaska 2016) (quoting *Sawicki v. Haxby*, 186 P.3d 546, 550 (Alaska 2008)).

[47]     *Sawicki*, 186 P.3d at 550-51.

The burden to produce sufficient evidence to support the necessary findings lies with the parties,[48] pursuant to the burden-shifting mechanism for imputed income we outlined in *Sawicki v. Haxby*,[49] We explained that "[o]nce the primary custodian has made out a prima facie case of voluntary and unreasonable underemployment the burden of persuasion shifts to the obligor to rebut that claim."[50]

The superior court here ruled that Fredrickson was "voluntarily unemployed" because after receiving money from the Japanese government, she "quit working and concentrated on charitable work and other projects." Fredrickson appears to have argued that her unemployment was not voluntary because her grief and depression made it impossible for her to work. But while Rule 90.3(a)(4) states that courts may not impute income to parents who are "physically or mentally incapacitated," Fredrickson offered no evidence — apart from her own conclusory testimony that she could not work due to grief and depression — that she was "physically or mentally incapacitated." Furthermore, as the court noted, Fredrickson had been employed as a bartender and had undertaken significant charitable work after her brother's death. Therefore, even if she were initially incapacitated due to her grief and depression, those issues were no longer a barrier to her employment. In other words, Fredrickson failed to offer evidence rebutting Button's prima facie case that Fredrickson was voluntarily unemployed based on the fact she quit working after receiving funds from the Japanese

---

[48] *Horne v. Touhakis*, 356 P.3d 280, 284 (Alaska 2015) (remanding for more detailed factual findings but noting that "the parties failed to provide evidence that would have allowed the superior court to make more detailed findings," and that "[t]he parties bear responsibility for this dearth of evidence").

[49] 186 P.3d at, 548-49.

[50] *Id.* at 548-49.

government. We therefore conclude that the superior court did not clearly err in finding that Fredrickson was voluntarily unemployed.

The court made no explicit ruling on the unreasonableness of Fredrickson's unemployment. As discussed above, a court must find that an obligor's unemployment or underemployment is both voluntary *and* unreasonable. However, on the record before us, the finding of unreasonableness is clearly implied. The court explicitly recognized the requirement to find the obligor both voluntarily and unreasonably unemployed before imputing income. Fredrickson argued that her unemployment was reasonable because she wished to pursue a career in nursing. The court acknowledged this argument in its December 2014 order, but found it unconvincing, noting that "Fredrickson has expressed an interest in attending nursing school, but has yet to take any classes." Fredrickson's argument that she could not work due to grief and depression is also relevant to the issue of reasonableness. However, the court also considered and dismissed both of these arguments, noting that Fredrickson had both been employed as a bartender and undertaken significant charitable work, evidencing an ability to work. Because the court recognized the need to find the unemployment unreasonable before imputing income, addressed and rejected each of Fredrickson's arguments on this issue, and ultimately decided to impute income to Fredrickson, a finding of unreasonableness is clearly implied. On this record, that finding is not clearly erroneous.[51]

---

[51] We note that in *Reilly v. Northrop*, we stated that the court "must make specific findings that the [obligor's] underemployment [or unemployment] is both voluntary and unreasonable." 314 P.3d 1206, 1212 (Alaska 2013). To the extent this implies both findings must be explicit, it is an incorrect statement of the law. In *Reilly*, the superior court did make explicit findings on both elements, so we never directly addressed the question of whether explicit findings were required. *Id.* at 1210. In practice, however, we have permitted implicit findings in this context. In *Barlow v. Thompson*, the superior court's child support order incorporated a master's report, and

(continued...)

### b. The court did not err in estimating Fredrickson's earning capacity based on her previous employment.

Fredrickson also argues that "income should not have been imputed to her based solely on her income three or more years previously, in jobs she could no longer obtain." She argues that "[n]o evidence was presented to show that that job still existed at the time of trial, or that she could find a similar job at the same pay level." She claims that the superior court did not make any findings "regarding [her] ability to obtain the same work she did in 2006 through 2010, or what the job would pay if she did obtain it," and she criticizes the court for finding that "her income would likely be the same as it was in those years" for the purposes of calculating the child support award.

The question presented here is whether, when the superior court has determined that the obligor's unemployment or underemployment is voluntary and unreasonable, the court is required to make explicit findings regarding the availability of jobs and the obligor's ability to perform such jobs before imputing income. We conclude that it is not.

Our past cases indicate that when an obligor parent voluntarily leaves her previous employment and unreasonably remains unemployed or underemployed, the

---

[51]     (...continued)
neither of those made an explicit finding of either unreasonableness or voluntariness. 221 P.3d 998, 1003 (Alaska 2009). On appeal, we found the voluntariness finding implied and supported by the record, but vacated and remanded because the master's failure to address factors relevant to reasonableness left us "unable to determine whether the implied imputation of income is clearly erroneous." *Id.* We therefore now clarify that we will not vacate a child support order merely because the findings of voluntariness and unreasonableness are implied rather than explicit, so long as the record indicates that the court properly considered both elements and there is sufficient evidence in the record for us to determine whether the imputation of income was clearly erroneous. That being said, best practice is for the trial court to make its findings explicit on both elements in every case.

court can impute income based on the obligor's previous earnings unless the obligor demonstrates that she would not be able to achieve a similar income. In *Sawicki v. Haxby*, the obligor sought a modification and reduction of her child support obligation after she left one job and took another that paid half as much.[52] The superior court found that she was voluntarily and unreasonably underemployed, imputed her prior income to her, and denied her motion.[53] The superior court did not make any specific findings in order to calculate her child support obligation, because it did not need to: a child support obligation had already been calculated previously, and the court simply denied Sawicki's motion to reduce it.[54] On appeal, after determining that the superior court did not clearly err in finding the obligor voluntarily and unreasonably unemployed, we held that "[g]iven [the mother's] extensive sales experience and savings, it was not error to impute income to [her] at the salary she recently earned."[55] In *Pugil v. Cogar*, the obligor father, who had previously been a commercial fisherman, moved to Texas shortly before trial to change careers.[56] The father asked the court to base his child support obligation on his lower prospective earnings in his new career.[57] The superior court declined, reasoning that "it is [the obligor's] earning capacity which [the court] should consider in setting his

---

[52] 186 P.3d at 547.

[53] *Id.*

[54] *Id.*

[55] *Id.* at 551.

[56] 811 P.2d 1062, 1064 (Alaska 1991).

[57] *Id.*

child support obligation rather than what he actually chooses to make,"[58] and computed the father's income by averaging three years of his fishing income.[59] The trial court did not make any specific findings that any particular fishing opportunity was available to him. Rather, the court noted that the father "ha[d] made no showing that he [could ]not continue to work part time as a fisherman."[60] On appeal, we affirmed, concluding that "the superior court considered all of the relevant circumstances."[61] We have reached similar results, affirming the superior court's imputation of income based on previous earnings without findings as to specific job opportunities, on several occasions.[62] However, because we acknowledge that our decisions in other cases may have created some uncertainty on this point, we take this opportunity to distinguish those cases and clarify our holding.

In two cases, we vacated the superior court's imputation of income for lack of findings indicating the existence of real employment opportunities that would pay the imputed amount. In *O'Connell v. Christenson*, the superior court had estimated imputed income by assuming that a fast food employee would make $20,000 per year and then doubling that figure because the obligor "was capable of doing work substantially more remunerative than that."[63] Similarly, in *Horne v. Touhakis*, the superior court considered the self-employed obligor's estimate of his income, found that he had "underestimate[d]

---

[58] *Id.*

[59] *Id.*

[60] *Id.* at 1066.

[61] *Id.* at 1067.

[62] *See Silvan v. Alcina*, 105 P.3d 117, 125 (Alaska 2005); *Olmstead v. Ziegler*, 42 P.3d 1102, 1106 (Alaska 2002).

[63] 75 P.3d 1037, 1041 (Alaska 2003).

the market value of his skills and experience," and without further explanation doubled the estimate.[64] In both of these cases, the imputed income was based not on previous income, but on arbitrary multiplication and "the superior court's intuitions"[65] about the obligor's earning capacity, without any evidentiary support. This is distinguishable from the case at hand, where the superior court based the imputation of income on concrete evidence as to Fredrickson's previous earnings.

In *Petrilla v. Petrilla*, we also found an abuse of discretion in the superior court's imputation of income to the obligor based on his prior salary.[66] However, in that case, the obligor's specific earning capacity was not at issue. The obligor in *Petrilla* had moved out of state, and after an extended period of unemployment — during which his income was imputed at a level equivalent to his previous salary — he eventually found a job with the State of Nevada.[67] The obligor then filed a motion to modify his child support obligation based on his new employment income.[68] The superior court denied this motion, reasoning that he had waited an unreasonable amount of time before securing employment, and that "he could have been earning more than twice his unemployment income had he made the effort."[69] On appeal, we vacated the order denying the request for modification because "[i]n effect, the superior court concluded that [the obligor] was voluntarily and unreasonably underemployed even after he secured

---

[64]     356 P.3d 280, 282 (Alaska 2015).

[65]     *Id.* at 283.

[66]     305 P.3d 302, 303 (Alaska 2013).

[67]     *Id.* at 304-05.

[68]     *Id.* at 305.

[69]     *Id.*

full-time employment."[70]  In other words, we did not conclude that previous earnings were an inappropriate basis for determining the amount of imputed income, but rather that the superior court in that case had failed to show that *any* amount of imputed income was appropriate.

We reaffirm the burden-shifting mechanism for imputed income we outlined in *Sawicki v. Haxby*,[71] and conclude that that mechanism applies equally to determining whether to impute income and to determining how much income to impute. The obligor's previous earnings can serve as prima facie evidence of her earning capacity, and the burden is on the obligor to show that no job opportunities are available to her that would pay an equivalent amount.  The superior court may not, however, impute as income an entirely arbitrary amount with no support in the record, or impute income based on previous earnings where there is no indication that the obligor is currently unemployed or underemployed.

In this case, Fredrickson points to evidence that she did in fact earn less after 2011, and asserts that there is no indication in the record that either her previous job or a similar job would be available.  However, as we have explained, the burden was on Fredrickson to show that a job of equivalent pay was *not* available, and we review the amount of income imputed to a child support obligor only for clear error.[72]  Fredrickson never provided any reason for the court to think that if she returned to work full time she would be unable to earn as much income as she did previously in her work as a delivery

---

[70]     *Id.* at 307.

[71]     186 P.3d 546, 548-49 (Alaska 2008) ("Once the primary custodian has made out a prima facie case of voluntary and unreasonable underemployment the burden of persuasion shifts to the obligor to rebut that claim.").

[72]     *Reilly v. Northrop*, 314 P.3d 1206, 1212 (Alaska 2013).

driver. Thus, the superior court did not clearly err in relying on Fredrickson's past income to determine her earning capacity.

### b. Fredrickson's proposed return to school did not justify a change to the imputed income calculation.

Fredrickson also argues that her plan to return to school justified a change to her calculated imputed income, relying on our cases that instruct trial courts "to consider all the circumstances of [a] change in employment to determine [child support]."[73] When a superior court makes decisions about how a parent's plans to change careers will impact a child support award, we have held that the court must consider the needs of the child, the ability of the custodial parent to meet those needs, and the parent's work history, qualifications, and job opportunities.[74] We have also cautioned that "Rule 90.3(a)(4) does not rigorously command pursuit of maximum

---

[73] *Pugil v. Cogar*, 811 P.2d 1062, 1066 (Alaska 1991) (second alteration in original); *see Beaudoin v. Beaudoin*, 24 P.3d 523, 529-31 (Alaska 2001) (reversing summary judgment where all circumstances surrounding mother's decision to remain unemployed even after reducing custody from full-time to only a third of the time raised a genuine issue of material fact regarding whether she was "voluntarily and unreasonably unemployed"); *Pattee v. Pattee*, 744 P.2d 658, 662 (Alaska 1987), *overruled on other grounds by Nass v. Seaton*, 904 P.2d 412 (Alaska 1995) ("[T]he judge [is] to consider the nature of the changes and the reasons for the changes, and then to determine whether, under all the circumstances, a modification is warranted." (quoting *In re Marriage of Rome v. Rome*, 621 P.2d 1090, 1092 (Mont. 1981))); *see also Flannery v. Flannery*, 950 P.2d 126, 131, 133 (Alaska 1997) (remanding for the superior court to consider whether reduced income from medical practice justified a change in child support obligations); *Arndt v. Arndt*, 777 P.2d 668, 669-70 (Alaska 1989) (remanding for the superior court to modify child support awards where father's income decreased by more than 50%, mother's income increased, and child custody significantly changed); *Curley v. Curley*, 588 P.2d 289, 292-93 (Alaska 1979) (refusing to modify child support award where father argued his income had decreased by about $400 per month and his expenses now exceeded his income).

[74] *See Beaudoin*, 24 P.3d at 528 n.14; *Pugil*, 811 P.2d at 1066.

earnings."[75] And the Commentary to Civil Rule 90.3 provides that "[w]hen a parent makes a career change, this consideration should include the extent to which the children will ultimately benefit from the change."[76]

In *Pattee v. Pattee* we held that a non-custodial parent who voluntarily reduced his income to return to school should not automatically receive a corresponding reduction in his child support obligation because the children and custodial parent "should not be forced to finance the noncustodial parent's career change."[77] In *Olmstead v. Ziegler* the superior court concluded that a father's decision "to quit the private practice of law and undertake training for a new career cannot be viewed as anything but a voluntary move on his part."[78] We affirmed the superior court's decision.[79] And in *Pugil v. Cogar* we upheld the superior court's determination that the father's support obligation should be calculated based on his potential income as a commercial fisherman, rather than his actual income, even though the father had plans to continue his education and leave his fishing career.[80] The father in *Pugil* asked the court to compute his child support obligation based on his prospective earnings as a welder — the new career he wished to pursue — but the superior court stated that it would instead consider his earning capacity as a fisherman "rather than what he actually chooses to make" because

---

[75]  *Beaudoin*, 24 P.3d at 530.

[76]  Alaska R. Civ. P. 90.3 cmt. III(C).

[77]  744 P.2d at 662.

[78]  42 P.3d 1102, 1105 (Alaska 2002).

[79]  *Id.* at 1107.

[80]  811 P.2d 1062, 1067 (Alaska 1991).

"his unilateral decision to go to school should not affect his child support obligation."[81] We upheld the court's decision, noting that the father could work part-time as a commercial fisherman.[82]

At the same time, "we do not believe that an obligor-parent should be 'locked in' to a particular job or field during the minority of his or her children when accepting a lower paying position may ultimately result in personal or professional advancement."[83] We have ultimately explained that "[t]he [j]udge [is] to consider the nature of the changes and the reasons for the changes, and then to determine whether, under all the circumstances, a modification is warranted."[84]

Fredrickson testified that she planned to return to school to study nursing because she did not have a passion for bartending or truck driving, explaining that her brother's death caused her to realize that she should do something to make a difference for others. She also explained that truck driving and bartending make it too difficult for her to exercise shared custody. While acknowledging that she had not yet solidified these plans to return to school, she argued that the ongoing litigation made it impossible to plan her return. Fredrickson contends that the superior court failed to make sufficient findings regarding her plans to return to school under *Pattee*'s requirement that the court consider her "reasons for returning to school, the other income available to the parties, and the reasonable needs of [her child]" when calculating her child support obligations.

---

[81]     *Id*. at 1064.

[82]     *Id*. at 1066-67.

[83]     *Nass v. Seaton*, 904 P.2d 412, 418 (Alaska 1995) (quoting *Pattee v. Pattee*, 744 P.2d 658, 662 (Alaska 1987)).

[84]     *Id*. (quoting *Pattee*, 744 P.2d at 662) (third alteration in original).

But the superior court did take Fredrickson's plans to return to school into consideration. The court stated that Fredrickson "has expressed an interest in attending nursing school, but has yet to take any classes." It is clear from the court's order that it concluded that Fredrickson's proposed return to school did not justify a change to the imputed income calculation. This conclusion was not clearly erroneous. For this reason, and for the reasons discussed above, we conclude that it was not abuse of discretion for the court to impute income to Fredrickson based on her previous earnings from 2006 to 2010.

### 2. The superior court did not err by declining to impute income to Button.

Fredrickson argues that the superior court erred in failing to impute income to Button for 2010 through 2012. She argues that Button was "capable of earning well over $100,000 per year" but that "in relevant years [between 2010 and 2012], he had much less, or no[,] employment income, for very unclear reasons." Fredrickson claims that because Button's "tax returns show him being almost totally unemployed from 2009 until sometime in 2011[] and earning far below his historic and future income in 2011 and 2012" and because "the [superior] court made no findings whatsoever regarding whether he was voluntarily unemployed or underemployed during that time," "it was an abuse of discretion for the [superior] court not to consider imputing income to [Button] during this period."

Typically, "[i]n making *retrospective* rather than *prospective* child support awards actual income rather than earlier predictions as to income should be used."[85] The superior court followed this rule. It imputed income to Fredrickson based on her future earning capacity to determine the prospective child support award, and it used Button's

---

[85] *Spott v. Spott*, 17 P.3d 52, 56 (Alaska 2001) (emphasis added) (citing *Crayton v. Crayton*, 944 P.2d 487, 490 (Alaska 1997)).

actual income from 2010 through 2012 to calculate the retrospective award.[86]  It would have been improper to impute income to Button pursuant to Rule 90.3(a)(4) for past years, and we conclude that the court did not err in not imputing income to Button for the purposes of calculating the retrospective child support award.[87]  It therefore did not need to make findings about Button's unemployment during that period.

**D.     The Superior Court Did Not Err In Concluding That Attorney's Fees Should Be Awarded Under Rule 82.**

After trial Button moved for an award of attorney's fees as the prevailing party under Rule 82(a) and (b)(1).[88]  Typically, Rule 82 permits the prevailing party to be awarded attorney's fees.  However, we have held that attorney's fees in divorce cases

---

[86]     For example, the superior court included in Button's 2010 income a large capital gain he received from the sale of his duplex.  Specifically, the superior court determined Button's support obligation for 2011, 2012, and 2013 by relying on the actual resources he had available, namely $33,057.40 in 2011, $49,158.04 in 2012, and $80,882.48 in 2013, as his tax returns reflected.  Button did not appeal the superior court's calculation of his income. Fredrickson only challenged the superior court's decision not to impute income to Button, as discussed in Section IV.C.2.  Thus, we need not consider whether the superior court otherwise erred in its income calculations.

[87]     Fredrickson raises a similar argument about the court's imputation of income to her for 2014, but she failed to raise it until her reply brief, and "we will not consider issues raised for the first time in a reply brief." *Crane v. Crane*, 986 P.2d 881, 887 n.14 (Alaska 1999) (citing Alaska R. App. P. 212(c)(3); *McGee v. McGee*, 974 P.2d 983, 989 (Alaska 1999); *Petersen v. Mutual Life Ins. Co.*, 803 P.2d 406, 411 n.8 (Alaska 1990)).

[88]     Alaska R. Civ. P. 82(a) ("Except as otherwise provided by law or agreed to by the parties, the prevailing party in a civil case shall be awarded attorney's fees calculated under this rule."); Alaska R. Civ. P. 82(b)(1) (requiring the court to adhere to a specific schedule in fixing the amount of attorney's fees awarded).

should be "based on the relative economic situations and earning powers of the parties"[89] rather than prevailing party status, to ensure that "both spouses have the proper means to litigate the divorce action on a fairly equal plane."[90] And we have extended this divorce exception to quasi-divorce actions involving child custody and support proceedings between unmarried couples.[91]

Fredrickson contends that the issue of child support was part of the initial custody case but was reserved for later determination when the custody issues were settled.[92] She argues that Alaska law precludes a Rule 82 award of fees in this case, as the facts resemble those in *Bergstrom v. Lindback*. The superior court disagreed, finding that the "issues being litigated do not resemble a divorce case, but rather involve issues relating to long past due child support" that were "strictly about money and arose long after the parties split up as a couple." The court therefore awarded Button attorney's fees.

---

[89]     *Kowalski v. Kowalski*, 806 P.2d 1368, 1372 (Alaska 1991).

[90]     *Lone Wolf v. Lone Wolf*, 741 P.2d 1187, 1192 (Alaska 1987).

[91]     *Bergstrom v. Lindback*, 779 P.2d 1235, 1238 (Alaska 1989) (holding that because the case "between unmarried individuals was limited to issues of child custody and support," the award of attorney's fees "should be governed by the standard used in divorce actions" such that attorney's fees are "based on the parties' relative economic situations and earning powers").

[92]     Fredrickson also argues that the parties agreed to bear their own costs and fees in the settlement agreement, and the superior court should have "honor[ed] the parties' express agreement that no attorney's fees would be awarded." However, as the superior court found, "[w]hile the parties did agree to settle a portion of the case, the issue of past child support was expressly excepted out of the agreement and has been hotly litigated," suggesting that the attorney's fees agreement in the settlement document applies only to the portion of the dispute settled there.

We agree with the superior court's analysis. Typically, we decline to apply the divorce exception to cases involving child support issues between unmarried parties. In *Sanders v. Barth* we explained that

> the divorce exception to Rule 82 should remain an exception to the rule, not the rule itself. If a case does not closely resemble a divorce action or if it does not involve the kinds of issues — such as the initial determination of custody and child support — that generally arise in the immediate aftermath of a long-term relationship break-up, the superior court should not apply the divorce exception to the award of attorney's fees.[93]

We refused to apply the divorce exception in *Sanders* because the case was "strictly about money" and the parties were "litigating child support issues more than ten years after their relationship broke up."[94]

Here, Button brought the underlying custody action in 2013, almost seven years after the parties separated. Of greater significance, the child support portion of this case is "strictly about money."[95] The parties participated in a settlement conference at which they resolved the custody issues, but they expressly reserved issues of past and present child support for later resolution by the court. This weighs in favor of not applying the divorce exception. We conclude that the superior court did not err in determining that Rule 82(a) and (b)(1) was the correct standard to apply in this case.

But because we are reversing one of the superior court's decisions and remanding for further proceedings, the court's determination of the prevailing party and

---

[93]     12 P.3d 766, 768 (Alaska 2000).

[94]     *Id*. at 769.

[95]     *Id*.

its fee award to Button must be vacated. The court can revisit the attorney's fee issue after it decides nature and appropriate treatment of the Japanese payment.

## V.    CONCLUSION

We VACATE the superior court's decision to treat Fredrickson's money from the Japanese government as income when calculating the retrospective child support award and REMAND for a determination of the exact nature of that payment and a recalculation of the retrospective award consistent with this opinion. We AFFIRM the court's decision to apply Rule 90.3 in its calculation of retrospective child support. We AFFIRM the court's decision to impute income to Fredrickson, AFFIRM the court's decision not to impute income to Button, and VACATE the award of attorney's fees to Button. We do not retain jurisdiction.

BOLGER, Justice, dissenting.

The superior court found that Shelley Fredrickson left her employment after receiving $300,000 in settlement payments from the government of Japan. But this court's decision requires the superior court to reconsider whether Fredrickson's compensation payment should be considered income for child support purposes. In my opinion, the evidence is sufficient to support the superior court's conclusion. When Forest Button's counsel asked, "Did you receive a *settlement* from Japan for your brother?" (Emphasis added.) Fredrickson responded, "Yes, I did." She then confirmed that the settlement was $300,000 and that she received it in 2012.

Many cases from other states hold that settlement payments should be treated as income for child support purposes.[1] These cases are consistent with

---

[1] *Stuart v. Stuart*, 260 S.W.3d 740 (Ark. App. 2007) (holding that class-action settlement fell within the definition of "income" for child support purposes); *Slaughter v. Slaughter*, 867 A.2d 976 (D.C. 2005) (defamation settlement); *Mayfield v. Mayfield*, 989 N.E.2d 601 (Ill. 2013) (workers' compensation settlement); *Carmer v. Carmer*, 45 N.E.3d 512 (Ind. App. 2015) (structured settlement payments from personal injury settlement); *Chapman v. Evans*, No. 01-2060, 2002 WL 31528541 (Iowa App. 2002) (lump sum wrongful termination settlement); *Guidry v. Guidry*, 6 So. 3d 845 (La. App. 2009) (payments from personal injury settlement); *Good v. Armstrong*, 554 N.W.2d 14 (Mich. App. 1996) (personal injury settlement); *Sherburne Cty. Soc. Servs. ex rel. Schafer v. Riedle,* 481 N.W.2d 111 (Minn. App. 1992) (structured settlement payments); *Taranto v. State Dep't of Soc. Servs.*, 962 S.W.2d 897 (Mo. App. 1998) (personal injury settlement payments); *In re State ex rel. Taylor*, 904 A.2d 619 (N.H. 2006) (personal injury settlements); *Cleveland v. Cleveland*, 592 A.2d 20 (N.J. Super. App. Div. 1991) (personal injury settlement lump sum); *Mirkin v. Mirkin*, 842 N.Y.S.2d 548 (App. Div. 2007) (lawsuit settlement); *Spicer v. Spicer*, 607 S.E.2d 678 (N.C. App. 2005) ("income" in child support guidelines included awards intended to compensate for non-economic loss); *Dupay v. Dupay*, 782 N.W.2d 42 (N.D. 2010) (personal injury settlement); *Herrera v. Herrera*, 298 P.3d 1209 (Okla. Civ. App. 2013) (sexual abuse settlement payments); *Arneson v. Arneson*, 670 N.W.2d 904 (S.D. 2003) (medical malpractice settlement proceeds); *Lyman v. Lyman*, 795 N.W.2d 475 (Wis. 2011) (wrongful

(continued...)

Civil Rule 90.3(a)(1), which defines child support income to include "the parent's total income from all sources." The commentary explains that "[t]his phrase should be interpreted broadly to include benefits which would have been available for support if the family had remained intact."[2] The settlement funds that Fredrickson received easily fit within this broad definition. The superior court found, "After receiving the disbursement, Ms. Fredrickson quit her job and lived solely on the $300,000."

But even if these funds are characterized as a gift, they should be counted as part of Fredrickson's income. In *Crayton v. Crayton*, this court distinguished between the treatment of one-time gifts and inheritances in actions involving *retrospective* calculations of child support and the treatment of one-time gifts and inheritances in actions involving *prospective* calculations of child support.[3] More specifically, this court distinguished between (1) reimbursement-type child support calculations where a court is asked to retrospectively calculate a parent's child support obligation for periods in the past where no child support order existed and (2) prospective child support calculations where a court is asked to determine a parent's future obligations based on expected future income.[4]

In *Crayton*, a father brought a motion for reimbursement of child support from the mother for a period during which no child support order existed.[5] At trial, the father argued that certain one-time monetary gifts the mother had received should be

---

[1]    (...continued) termination settlement).

[2]    Alaska R. Civ. P. 90.3 cmt. III.A.

[3]    944 P.2d 487, 490 (Alaska 1997).

[4]    *Id.*

[5]    *Id.* at 488.

included in her income for the purpose of determining her child support obligation for that period.[6] The trial court rejected the father's request under *Nass v. Seaton*,[7] but this court reversed, holding that

> [i]n cases such as *Nass*, where the court must establish a child support obligation for the future, the inclusion as income of a one-time gift or an inheritance would unfairly inflate that obligation beyond the obligor's reliable future resources. However, in this case, [the mother]'s future payments are not at issue and no question exists as to whether she will continue to receive the gifts. Because the superior court will determine [the mother]'s income only in retrospect . . . it is fair for the court to base the amount of reimbursement on the actual resources available to [the mother] during that period.[8]

This precedent permitted the trial court in this case to count the funds from Japan as income, since the funds were used in calculating a retrospective, rather than a prospective award. I see no reason to overturn that precedent in this case.

In my opinion, the trial court did not err when it included Fredrickson's settlement funds as income in its calculation of her child support obligation during a period when no child support order existed. The funds were actual resources available to Fredrickson, "which would have been available for support if the family had remained intact."[9]

---

[6]     *Id*. at 489.

[7]     904 P.2d 412 (Alaska 1995).

[8]     *Crayton*, 944 P.2d at 490 (citations omitted).

[9]     Alaska R. Civ. P. 90.3 cmt. III.A.