OPINION ~
BOLGER, Justice.
I. INTRODUCTION
A non-custodial parent moved to modify a child support order after she quit her job in Anchorage, moved to a remote village, and adopted a subsistence lifestyle Although the parent acknowledged that she was voluntarily unemployed, she argued that her decision was reasonable in light of her cultural, spiritual, and religious needs, The supenor court disagreed and demed the motion.
The parent appeals, argumg that the superior court gave inadequate weight to her cultural and religious needs and that the child support order violates her right to the free exercise of her religion. But the superi- or court adequately considered all relevant factors in deciding not to modify the child support order. And there was no plain error in the court's failure to anticipate the free exercise claim, which the parent raises for the first time on appeal. Therefore, we affirm the judgment of the superior court.
*68 IL - FACTS AND PROCEEDINGS _.
Jolene Lyon [1] and Jyzyk Sharpe divorced in July 2012. The superior court awarded Jyzyk primary physical custody of the parties' only child and ordered Jolene to pay Jyzyk $1,507.00 per month in child support.
' Jolene is a Yupik Eskimo who was raised in Nome and has family ties to the native village of Stebbins. When the child support order was issued, Jolene was "living in Anchorage, working at Alyeska Pipeline Service Company, and earning approximately [$]120,-000 a year." In April 2018, she left Anchorage and took up a subsistence hfestyle in Stebbins.
Soon after relocating to Stebbins, Jolene moved to modify the child support order. She alleged that she was "no longer: employed," that she. was "a full time stay at home mother,"[2] and that her only income was her annual Permanent Fund Dividend. These developments, she argued, constituted a material change in circumstances warrant ing a modification of the child support order. She requested that the court reduce her monthly child support payment to $50 per month, the minimum allowed under Alaska Civil Rule 90.8(c)(8).
Jyzyk opposed the motion, arguing that modification of the child support order was not warranted because Jolene was "voluntarily and unreasonablfy] unemployed " Although he acknowledged that Jolene was entitled to quit her job and move to a remote community, he argued that the parties' "ten year old daughter ... should not be required to fund [Jolene's] 11festy1e choice." '
The superior court held a motion hearing in July 2018. During the hearing, Jolene testified about her life in Stebbins and the benefits she derived from her subsistence lifestyle, She expressed her desire to expose the parties' child to traditional life in Steb-bins. And she said that living in Stebbins, a dry community, provided reprieve from an alcohol abuse issue she had experienced during her marriage.
Jyzyk also testified at the hearing, He expressed his belief that the parties' child would benefit from receiving child support from Jolene at its existing amount and noted that these monthly payments "helped with 'everything [including] rent, groceries, [and] clothes." Jyzyk testified that "[in a dream world [he] would bring [the parties' child] to Kotzebue [in the area where he was raised] and raise her on the Fiver," but he recognized that financial constraints prevented him from prudently fulfilling this dream.
After the hearing the superior court denied Jolene's motion, Although the court acknowledged that "[Jolene] is finding sort of a spiritual awakemng or reconnecting with Native dance, Native culture, [and] subsistence lifestyle" and that life in Stebbins is "rehabilitative for her," it concluded:; "[Gliven [Jolene's] background and her previous earnings I do not agree that ... she does not have any income capacity simply because she chose to relocate to the village of Stebbins and earn nothing. . . ." Jolene appeals.[3]
III. STANDARD OF REVIEW
"Trial courts have broad discretion in deciding whether to modify child support orders."[4] "We review an award of child support, including a modification to such an award, for abuse of discretion...." [5] "A superior court abuses its discretion by making a decision that is arbitrary, capricious, manifestly unreasonable, or ... stemf[s] from an improper motive." [6] "We use the clearly er-foneous ' standard when reviewing factual *69 findings, including findings regarding a party’s income, imputation of income, and voluntary underemployment.”[7] Factual .findings “are clearly erroneous when, ‘after reviewing the record as a whole, [we are] left with a definite and firm conviction that a mistake has been made.’ ”[8] We review the superior court’s interpretation of the civil rules[9] and the Alaska Constitution[10] de novo.
IY. DISCUSSION
A. The Superior Court Properly Considered The Financial Impact Of Jolene’s Decision To Move To Stebbins And Adopt A Subsistence Lifestyle On Her Child.
Jolene argues that it was an abuse of discretion to deny her motion to modify' the child support order. In particular, she argues that it was unreasonable for the superi- or court “to direct nearly total focus on [her] past income history and ignore other important factors,” including the burden of. the child support obligation on her free exercise of religion and the ameliorative effect of a subsistence lifestyle on her struggle with alcohol.
When one parent takes primary physical custody of a child after divorce, the noncustodial parent is required to pay child support “equal to the adjusted annual income of the non-eustodial parent multiplied by” a specified percentage.[11] Although the “adjusted annual income” is typically calculated using the parent’s actual income,[12] under Alaska Civil Rule 90.3(a)(4) “[t]he court may calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed.” “Potential income will be based upon the parent’s work history, qualifications, and job opportunities.” [13] As we have noted, the aim-of Alaska Civil Rule 90.3(a)(4) “is to give courts broad discretion to impute income based on realistic estimates of earning potential in cases of voluntary and unreasonable unemployment or underemployment.’* [14]-
Jolene conceded that she was voluntarily unemployed.. Therefore, the only issue at the hearing was whether her decision to be unemployed was unreasonable. The superior court concluded that it was.
In déterminiííg whether a parent is “unreasonably” unemployed, the superior court must look to the totality of the circumstances, including “such factors as whether the obligor’s reduced income is temporary, whether the change is the result of economic factors or of purely personal choices, the children’s needs, and'the parents’ needs and financial abilities.”[15] But “[b]eeause of the significance of a parent’s duty to meet his or her child support obligations, we prioritize fulfillment of that duty over even legitimate decisions to be voluntarily -unemployed or underemployed.”[16] And we have consistently recognized that, when a child support obli-gor makes a career change for personal reasons, the superior court should consider the financial impact of this decision on the child.[17]
*70 In Pattee v. Pattee, our first case considering imputed income, the noncustodial parent quit his job at a bar in Anchorage and moved to Washington to enroll in Tacoma Community College.[18] We rejected the notion that a voluntary career change should require an automatic reduction in child support:
On the one hand, we do not believe that an obligor-parent should be "locked in" to a particular job or field during the minority of his or her children when accepting a lower-paying position may ultimately result in personal or professional advancement. On the other hand, the children of the marriage and the custodial parent should not be forced to finance the noneus-todial parent's career change. We believe that the better rule is that stated by the Montana Supreme Court: "[The judge [is] to consider the nature of the changes and the reasons for the changes, and then to determine whether, under, all the cireum-stances, a modification is warranted," [19]
We remanded the case to allow the trial court to examine the reasons for the father's unemployment and establish an appropriate child support obligation."[20]
The foregoing quote recognizes that a child support obligor should not be "locked in" to a particular career. But this language is in a sentence that implies that a career change must be supported by a "lower-paying position" that will "ultimately regult in personal or professional advancement." And this sentiment is immediately followed by the observation that "the children ... and the custodial parent should not be forced to finance the noncustodial parent's career change." Thus the financial impact of a career change on the obligor's children has always been regarded as an important factor when a trial court examines whether voluntary unemployment .is reasonable.
A few years after the Pattee decision, we applied the same rationale: to a case where the child support obligor had moved from Alaska to El Paso, Texas to study engineering.[21] The obligor testified that he decided to change careers because he was " 'burned out' on fishing [his prior career] and wanted a safer, less strenuous career,"[22] The trial court commended the obligor's pursuit of further education but noted that his plan to enroll as a part-time student and to work as a part-time welder "is not completely realistic" because he could pursue his education while working as part-time fisherman to fulfill his child support obligation.[23] The trial court imputed income to the obligor based on his previous employment in Alaska as a welder and commercial fisherman rather than on his prospective earnings as a welder in El Paso, and we affirmed.[24]
- Similarly, in Olmstead v. Ziegler we considered the case of a child support obligor who left the practice of law and returned to school to become a teacher.[25] The superior court concluded that it was unreasonable for the obligor "to train for a position that is Tess remunerative than that his current education and experience justifies." [26] Though it expressed "[nlo moral criticism of [the obli-gor's] lifestyle change," the superior court was unwilling to "shift any of the consequent burden [of the career change] to the narrow shoulders of [the] child."[27] 'We affirmed, noting that the obligor had failed to demon *71 strate that his career change would beneﬁt his child.[28]
In recent cases, we have repeatedly stated that the "relevant inquiry" when imputing income is "whether a parent's current situation and earnings reflect a voluntary and unreasonable decision to earn less than the parent is capable of earning."[29] And the commentary to Alaska Civil Rule 90.8 specifically requn'es the superior court to examine the financial impact on the child in deciding whether to impute income: "When a parent makes a career change, [the totality of the cireamstances] consideration 'should include the extent to which the children will ultimately benefit from the change."[30] This directive implies that a court may consider the financial impact of a career change on a child, because the amount of child support inevitably affects the child's well—bemg
There are certainly cases Where we have affirmed child support modifications when a career change was partly motivated by personal factors.[31] But these cases simply illustrate that the superior court has a wide range of discretion when addressing this issue. The fact that some cases have treated relocation decisions as reasonable does not free the superior court from the obligation to consider the financial impact of a career change on the obligor's child. Jolene does not cite any cases where we have held that the consideration of this impact was an abuse of discretion.
In this case, Jolene moved to Steb-bins and adopted a subsistence lifestyle without any intention of seeking employment to meet her child support obligation. In support of her request for reduction of her child support obligation, she specifically stated that she had "no intention to return to the work force." The record thus supports the superior court's conclusion.that Jolene's decision to leave her employment and move to Stebbins would have an unreasonable financial impact on the resources available to care for her daughter.
The dissent argues that when a court imputes income after an obligor relocates, the reasonableness of the obligor's decision to relocate must be analyzed prior to and separately from the reasonableness of the obli-gor's unemployment. It contends that onee the decision to relocate is found reasonable, imputed income must be based on. the obli-gor's new place of residence rather than former residence. The dissent concludes that the trial court should have found Jolene's decision to move to Stebbins reasonable and erred in imputing Jolene's income based on her former job in Anchorage rather than her employment opportunities in Stebbins.
As the dissent recognizes, neither Rule 90.8(a)(4) nor Child Support Services Division regulations say anything "about considering the reasonableness of a parent's decision to relocate" prior to and separately from the reasonableness.:of the obligor's unemployment.[32] And the cases upon which the dissent relies also do not provide support for this contention. Rather these cases demonstrate that the obligor's reason for moving is simply one of the several factors courts may consider in deciding whether, an obligor is unreasonably unemployed.[33] ,
In Richardson v. Kohlin, contrary to the dissent's claim, we did not separately analyze the reasonableness of the obligor's move *72 from the reasonableness of his underemployment.[34] Rather we affirmed the superior court's consideration of the move's purpose as part of its totality of the cireumstances analysis.[35] - Moreover, unlike the present case, the obligor in Richardson actively sought employment in the Pacific Northwest after he was laid off from his job in Anchorage, a fact we found particularly salient.[36]
In declining to impute income based on the obligor's income in Alaska, we repeatedly emphasized the obligor's and "extensive attempts to find high-paying work in [his new location]." [37] We lauded the trial court for giving: "great weight to [the obli-gor's] efforts to:find work, the fact that he was [currently] working full time, and his active pursuit of higher paying work," and we noted that these efforts distinguished the case from cases in which we have upheld the imputation of income.[38] No such diligent efforts to find work are present in the case now before us. In contrast, as Jolene testified, she has not applied for any jobs in Stebbins and "hals] no intention to return to the workforce."
The dissent also relies on Petrilla v. Petrilla, but that case did not involve a review of the superior court's decision to impute income.[39] (In Petrillo, after the obligor moved from Alaska to Nevada and failed to find work,; the superior court issued a modified child support order imputing income to the obligor based on his potential income in Nevada[40] Neither party timely appealed that order.[41] - Rather the obligor then found a Job that paid less than the imputed income estimate and then moved to modify the post-relocation support order to reflect his actual income.[42] .After the superior court denied his request, the obligor appealed.[43]
'On appeal we recognized that, because the obhgor did not file a timely appeal of the superior court's decision to impute income, the obligor could no longer challenge that decision.[44] Thus the sole issue before us in Petrilla was Whether the superior court should have modified the support order to reflect the obligor's actual rather than imput-eqllsalary. Petrilla is not applicable to the case before us now. The issue here is . whether the superior court should have modified Jolene's support order, which was issued before Jolene moved and based on her actual income in Anchorage, to reflect her post-relocation cireumstances. - Unlike Petrillo, here we do not consider whether the superior court should have modified an imputed support order that was issued ofter the obligor relocated. __
'The dissent also misunderstands our deci-sion in Sawicki.[45] 'Similar to Petrilla, in we considered a child support order that the superior court issued after the obli-gor relocated to Indiana to take a new job.[46] 'When the obligor voluntarily left her new job 'for a lower-paying job, she asked the court to modify the order, but the court declined to do so.[47] Thus on appeal we considered whether the obligor was entitled to a reduction in child support based on her voluntary *73 change in employment.[48] The reasonableness of her move from Alaska to Indiana was not at issue because the challenged child support order postdated that move.
The dissent also draws support 'from our Moeller-Prokosch line of cases for its contention that the reasonableness of an obligor's decision to relocate must be considered separately from and prior to the reasonableness of unemployment.[49] Yet the Moeller-Pro-kosch cases do not lend such support because they consider child custody in light of a custodial parent's decision to relocate, not child support obligations when a al parent decides to relocate. These two issues-child custody and child support-have distinct considerations and courts accordingly analyze them differently.
In making custody determinations courts must apply the best interests of the child analysis.[50]" When a custodial parent seeks to relocate with the child, the court must analyze the reasonableness of the relocation decision to ascertain whether the move has illegitimate motives, such as a desire to prevent contact between the child and the non-custodial parent.[51] . If the court finds such illegitimate motlves, it must consider them in its best interests of the child analysis.[52] If not, the court cannot hold the parent's decision to relocate against the parent when determining custody.[53]
In contrast, when calculating child support courts do not conduct a best interests of the child analysis. Rather the noncustodial parent's child support obligation is based on a statutorily prescribed percentage of their actual or imputed annual income, as mandated by court rule.[54] Thus while the Moeller-Prokosch cases do require courts to consider whether a parent's decision to relocate is reasonable in custody cases, this requirement is inapplicable to child support determinations.
The dissent also argues that imputing income based on a non-custodial parent's job in a prior place of residence produces an asymmetry with the custodial parent's "absolute right to change careers, take a lower-paying job, ... quit work altogether|, or] perhaps even ... move to another geographic location with the children." [55] But this "absolute right" of the custodial parent exists only in theory, as demonstrated by Jyzyk’s testimony that "in a dream world" he would move back to his Native village with his daughter but "finances" prevented him from doing so. Contrary to the dissent's claim, custodial parents do not possess any such "absolute freedom"-their child's needs constrain their actions.[56] Further, Jolene's decision to exercise her freedom to move restricts Jyzyk's freedom to do the same,. While the dissent argues that our decision "effectively order[s] where a non-custodial parent must live and what specific job that parent must hold," [57] it fails to recognize that its preferred outcome would have the same limiting effect on the custodial parent, and consequently the child.
*74 B. The Superior Court Adequately Considered Jolene's Religious And Cultural Needs,.
Jolene argues that the superior court "direct[ed] nearly total focus on [her] past income history" and gave short shrift to Jolene's religious and cultural needs. It is true that "the parents' needs" is one of the factors the superior court must consider in evaluating the totality of the cireumstances.[58] But the superior court did adequately consider Jolene's needs, and after considering these needs it found that they did not outweigh other concerns, including her daughter's need for financial support: ° L
[Jolene] finds that [living in Stebbins] is sort of rehabilitative for her from the standpoint of her eliminating ... some of the poisons of urban life. . .. She is finding sort of a spiritual reawakening or reconnecting with Native dance, Native culture, subsistence lifestyle, all of which is ... admirable in an abstract sense.
Then again ... she effectively is ... taking a vacation from the financial responsibilities that she assumed when she had a child, and the result of her not working -and providing financial assistance is that it's going to impose ... a greater burden on [Jyzyk], but, more importantly, it's going to have an impact over time on 2111: Zggﬁgzﬁgestak; 0222 £73131; 03212351: daughter].
Now, I don't know whether it's realistic to continue child support at [$]120,000 a year, ... but given her background and her previous earnings I do not agree that ' it should be that she does not have any income capacity simply because she chose to relocate to the village of Stebbins and earn nothing. ...
[[Image here]]
... I do find it a difficult choice in this case because [Jolene] does seem to derive some very valid benefits from being in Stebbins, and I'm sure that for the summers [her daughter] derives some benefits there, too, but then there's the other nine months of the year when [the parties' daughter] lives in Anchorage and she'd be Setting $50 a month, if that, instead of ... $1500 a month, which could go a long way toward providing for necessities and also toward ... providing for her future needs, educational needs, and to help give her a good start in life.
The record thus reflects that the superior court adequately considered Jolene's personal needs when it determined that her voluntary unemployment was unreasonable.[59]
Despite this consideration, the dissent worries that the superior court "trivialize[s] Alaska Natives' way of life" [60] and "devalues Alaska Natives' cultural, spiritual, and religious connections to their villages and their subsistence lifestyle."[61] Yet in reality the dissent's desired outcome would have enormous financial implications for Alaska Native children. - "The primary purpose of Rule 90.8 is to ensure that child support orders are adequate to meet the needs of children, subject to the ability of parents to pay." [62] Granting either parent absolute freedom to éxit the workforce would undermine this purpose.
C. There Was No Plain Error In The Superior Court's Failure To Address Jolene's Free Exercise Claim Sua Sponte.
Jolene argues that the child support order burdens her right to the free exercise of her religion under the Alaska Constitution because it effectively requires her to abandon *75 her Native religious and cultural heritage and maintain a stressful job in Anchorage. She argues that the superior court abused its discretion by failing to address this undue burden on her religious practice.
The Alaska Constitution provides that "Inlo law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof" [63] A person's conduct is protected by the Free Exercise Clause if (1) "a religion is involved, the conduct in question is religiously based, and the [person] is sincere in his or her religious belief"; and (2) "the conduct poses [no] substantial threat to public safety, peace or order," and "there are [no] competing governmental interests that are of the highest order and are not otherwise served." [64]
Jolene never argued before the superior court that the child support order should be modified because the existing order infringes her freedom of religion. Her motion to modify child support did not mention the Alaska Constitution's Free Exercise Clause. | And although she testified at the hearing about her spiritual and cultural connections to life in Stebbins and the religious character of Eskimo dancing, she never invoked the Alaska Constitution or otherwise argued that the child support order burdened her Native religious practices Therefore, Jolene's free exercise claim was never considered by the superior court, and we review it
for plain error only.[65]
Although Jolene presented ample testimony at the hearing about her subsistence lifestyle and the benefits she obtains from living in Stebbins, her testimony did not focus on whether her decision to move to Stebbins was motivated by religious belief, whether her alleged religious beliefs were sincere,[66] or whether her religious exercise would have been burdened had she remained in Anchorage and continued to work for Alyeska[67] .or sought employment in Stebbins. Without being presented with evidence and argument about these key questions, the superior court did not make an obvious mistake in failing to address the free exercise issue sua sponte. And even if the court had anticipated Jolene's free exercise claim, it could not have evaluated the merits of the claim using only the evidence elicited at the hearing. .We conclude that there was no plain error in the superior court's failure to address Jolene's free exercise claim. -
v. CONCLUSION .
The judgment of the superior court is AF— FIRMED.
- WINFREE, Justice, dissenting.
STOWERS; Justice, dissenting.

. Jolene was known as Jolene Sharpe until the pames divorced. To avoid confusion, we refer to both parties by their first names,

. Although Jolene did not have primary custody of the parties' daughter when she moved to mod- . ify the child support order, Jolene was caring for another child from a separate relationship.

. - Jyzyk did not participate in this appeal.

. Olmstead v. Ziegler, 42 P.3d 1102, 1104 (Alaska 2002) (citing Patch v. Patch, 760 P.2d 526, 529 (Alaska 1988)).

, Swaney v. Granger, 297 P.3d 132, 136 (Alaska 2013).

. Morris v. Horn, 219 P.3d 198, 203-04 (Alaska 2009), (alterations in original) (quoting Collins v. Arctic Builders, 957 P.2d 980, 981 (Alaska 1998) (internal quotation marks omitted)).

.Wilhour v. Wilhour, 308 P.3d 884, 887 (Alaska 2013) (footnotes omitted).

. Bennett v. Bennett, 6 P.3d 724, 726 (Alaska 2000) (quoting Marine v. Marine, 957 P.2d 314, 316 (Alaska 1998)).

. Wolff v. Cunningham, 187 P.3d 479, 482 (Alaska 2008).

. Glover v. State, Dep’t of Transp., 175 P.3d 1240, 1245 (Alaska 2008).

. Alaska R. Civ. P. 90.3(a). The percentage varies according to the number of children the parties have. Alaska R. Civ. P. 90.3(a)(2).

. See Alaska R. Civ. P. 90.3(a)(1).

. Alaska R. Civ. P. 90.3(a)(4).

. Beaudoin v. Beaudoin, 24 P.3d 523, 530 (Alaska 2001) (first emphasis added).

. Sawicki v. Haxby, 186 P.3d 546, 550 (Alaska 2008) (citations omitted) (internal quotation marks omitted).

. Kestner v. Clark, 182 P.3d 1117, 1123 (Alaska 2008) (internal quotation marks omitted); see also id. ("[A] parent should not be relieved of the obligation to support his or her children except under the most extreme circumstances.”).

. See, e.g., Richardson v. Kohlin, 175 P.3d 43, 48-49 (Alaska 2008) ("When a parent is seeking a modification of support due to a change in employment the court should consider 'the extent to which the children will ultimately benefit from the change.’ ” (quoting Alaska R. Civ. P. *70 90.3 cmt. III.C)); Dunn v. Dunn, 952 P.2d 268, 270 (Alaska 1998) ("When determining the potential income of the obligor parent, the trial court must also balance the needs of the dependent children against the needs of the obligor for a career change." (Emphasis added.)). __

. 744 P.2d 658, 659 (Alaska 1987), overruled on other grounds by Nass v. Seaton, 904 P.2d 412 (Alaska 1995),

. Id. at 662 (alterations in original) (citations omitted).

. Id.

. Pugil v. Cogar, 811 P.2d 1062, 1064 (Alaska 1991).

. Id.

. Id. at 1064-66.

. Id. at 1065-67.

. 42 P.3d 1102, 1103-04 (Alaska 2002).

. Id. at 1105,

. Id.

. Id. at 1105-06.

. Reilly v. Northrop, 314 P.3d 1206, 1213 (Alaska 2013) (quoting Nunley v. State, Dep't of Rev., Child Support Enforcement Div., 99 P.3d 7, 11 (Alaska 2004)); see also Mallory D. v. Malcolm D., 309 P.3d 845, 849 (Alaska 2013); Ward v. Urling, 167 P.3d 48, 55 (Alaska 2007); Beaudoin, 24 P.3d at 528.

. Alaska R. Civ, P. 90.3 cmt. III.C (emphasis added).

. See Wilhour v. Wilhour, 308 P.3d 884, 889 (Alaska 2013) ("[The fact that a parent voluntarily leaves a better-paying job in order to be closer to a child and share the child's custody should rarely weigh against that parent in determining whether a reduction in child support is warranted."); Richardson v. Kohlin, 175 P.3d 43, 49 (Alaska 2008) (noting that the obligor's desire to be closer to his family was a legitimate reason for a move that caused the obligor to become underemployed).

. Dissent at 77.

. See Alaska R. Civ. P. 90.3 cmt. III.C (directing courts to consider "the totality of the circum-

. 175 P.3d at 43.

. "See id. at 48 ('The superior court found that . [the obligor's] underemployment was reasonable in' light of the legitimate reasons for his move 'and his diligent job search efforts." (Emphasis added.)).

. Id. at 45.

. Id. at 49.

. 1d.

. See dissent at 77-79, 82, 84 & n. 58 (citing Petrilla v. Petrilla, 305 P.3d 302(Alaska 2013)).

. Petrilla, 305 P.3d at 305.

. Id. at 306 ('Having elected to forgo a timely appeal of the [child support order imputing income], [the obligor] cannot challenge that order now in the context of an appeal of the denial of modification." (Citation omitted.)). j

. Id. at 305.

. Id. at 305, 308-09.

. Id. at 306.

. See dissent at 83-84 (citing Sawicki v. Haxby, 186 P.3d 546 (Alaska 2008)).

. See Sawicki, 186 P.3d at 547.

. Id.

. See id. .

. See dissent at 77 n. 9 (citing Moeller-Prokosch v. Prokosch (Moeller I), 27 P.3d 314 (Alaska 2001), and Moeller-Prokosch v. Prokosch (Mueller II), 53 P.3d 152 (Alaska 2002)).

. AS 25.24.150(c).

. See Moeller I, 27 P.3d at 316.

%, See id.

, See Moeller II, 53 P.3d at 155.

. Alaska R. Civ. P. 90.3.

. Dissent at 84-85.

. See Rego v. Rego, 259 P.3d 447, 451-52, 455-57 (Alaska 2011) (upholding a decision, based on the best interests of the child analysis, that forced a custodial father to choose between remaining in Alaska and retaining custody of his child or relocating to New Jersey, as planned, and losing custody). Contrary to the dissent's interpretation, we do seriously consider the right to relocate-in the context of the applicable framework. See id. at 456 ("A parent's decision to relocate ... changes the best interests calculus."); dissent at 77 & n. 9, 85 & n. 63. But, as we explained in Rego, "[the chance that the superi- or court's decision will influence [a custodial parent's] decision to move does not justify reversing the superior court's order." 259 P.3d at 456. ' Custody and child support orders may force parents, custodial and non-custodial alike, to make difficult decisions.

. Dissent at 84-85.

. Sawicki v. Haxby, 186 P.3d 546, 550 (Alaska 2008).

. , 5 we . Jolene also argues that, "because this case involves a choice made on cultural and religious grounds-a choice protected by the free exercise clause of the Alaska Constitution, ... a higher standard should be required to show that her decision was unreasonable under the circumstances." But she does not cite any cases to support the proposition that a totality of the circumstances test should give special weight to religious concerns. Jolene's religious rights are more appropriately addressed through a separate free exercise claim, which we consider next.

. RDissent at 80-81.

. Dissent at 85-86.

. Alaska R, Civ. P. 90.3 cmt.I.B.

. - Alaska Const. art. I, § 4.

. Larson v. Cooper, 90 P.3d 125, 131 (Alaska 2004) (alteration omitted) (internal quotation marks omitted).

. See David S. v. State, Dep't of Health & Soc. Servs., 270 P.3d 767, 774 (Alaska 2012). Plain error "exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted." Id. (quoting D.J. v. P.C., 36 P.3d 663, 668 (Alaska 2001)) (internal quotation marks omitted).

. Jolene represents that the superior court said it "had no reason to question her sincerity." But the court merely noted: "I don't question ... your sincerity and ... the value you place in reconnecting with [your] ... Native and historical ... cultural.. roots...." The court expressed no opinion about Jolene's religious beliefs.

. For example, Jolene testified that when she lived in Anchorage, although she was "weather-bound" there for "a couple years," she would travel to Stebbins "every February/March to come to the potlatch," and that she "came [to Stebbins] every opportunity [she and members of her family] knew that there was going to be Eskimo dancing."