*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PETER CHAPMAN, | ) | |
| | ) | Supreme Court No. S-18761 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-18-02589 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JULIA CHAPMAN, | ) | |
| | ) | No. 7748 – February 14, 2025 |
| Appellee. | ) | |
| | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances: Mila A. Neubert, Neubert Law Office, LLC, Fairbanks, for Appellant. John Foster Wallace, Zimmerman & Wallace, Fairbanks, for Appellee.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

CARNEY, Justice.

## I.     INTRODUCTION

A father appeals a child support modification order that increased his child support obligation. The superior court found that the father's acquisition of new businesses and access to income from a newly created trust constituted a material change of circumstances to justify the increased child support. The court found that the father had access to his trust's income of more than $800,000 in 2021 and that he was

in control of its distributions, regardless of whether he chose to take them. The parties previously stipulated to a child support arrangement based on their respective incomes which resulted in a $31.35 monthly obligation for the father. The court factored in the trust's income, imputed the income cap of $126,000, and increased his monthly child support obligation to $1,167.35.

Because the superior court did not clearly err by finding a material change of circumstances or abuse its discretion by imputing income to the father, we affirm its child support order.

## II. FACTS AND PROCEEDINGS

### A. Facts

Peter and Julia Chapman married in 2007 and have one minor child. In 2018 Julia filed for legal separation, and the following August she and Peter agreed that they would equally share custody and that child support would be calculated pursuant to Alaska Rule of Civil Procedure 90.3. In July 2020 they entered a stipulation that Peter would pay $500 per month in child support through December 31, 2020, and that the amount would be modified in January 2021 "based on the parties' then current earned income at the time of modification." The superior court entered a decree of divorce in July 2020 and adopted their stipulation. The child support award was modified in April 2021 based on Peter's 2020 income of $45,000, which, after a credit for health insurance premiums, resulted in Peter owing Julia monthly child support in the amount of $31.35.

During their marriage, Peter and Julia owned Alaska Auto Rentals, Inc. (AAR).[1] Peter was employed by AAR at the date of the evidentiary hearing, and since 2009 his salary has ranged from $26,000 to $100,000. A year after the divorce, Peter

---

[1] As part of a property settlement agreement, the parties agreed that all of Julia's stock in AAR would be redeemed for $480,000, with payments completed by 2025. But they amended the timeline in their July 2020 stipulation due to concerns for the business's viability during the pandemic.

established the Cephas Trust and moved AAR and other property he had acquired into the trust. The property in the trust included Affordable Used Cars, LLC and several real estate holdings LLCs.[2] Cephas Trust is an inter vivos trust of which Peter is the grantor, primary beneficiary, and investment trustee.

### B. Proceedings

Representing herself, Julia moved to modify child support in May 2022. In her motion she indicated that she believed Peter's income was greater than the $45,000 salary on which the 2021 child support order was based because he informed her that he did not qualify for the federal child tax credit[3] and because he "has several successful businesses and properties connected to his name through various LLCs and trusts."[4] Peter opposed modification, arguing Julia had not presented proof that his income had changed.[5]

Because Julia was representing herself the court interpreted her motion as her annual request for proof of Peter's income under Rule 90.3(e)(2).[6] The court ordered Peter to provide proof of all sources of income and instructed Julia that she would have 60 days to inform the court whether she intended to pursue the motion to modify child support.

---

[2]    AAR and the other businesses are pass-through entities for tax purposes.

[3]    The income limit to qualify for the child tax credit in 2021 was $150,000 if filing a joint return, $112,500 for head of household, or $75,000 if filing single or married filing separate. INTERNAL REVENUE SERV., IRS FACT SHEET: IRS REVISES THE 2021 CHILD TAX CREDIT AND ADVANCE CHILD TAX CREDIT FREQUENTLY ASKED QUESTIONS (July 2022), https://www.irs.gov/pub/taxpros/fs-2022-32.pdf.

[4]    Julia also noted there was a change in their son's medical expenses because a new diagnosis required weekly therapy and she could not afford to pay half of the cost of those appointments.

[5]    Peter also argued that there was no evidence their son's medical insurance would not cover the additional expenses.

[6]    *See Cook v. State*, 312 P.3d 1072, 1090 (Alaska 2013).

Julia hired counsel. Peter provided his 2021 W-2 form from AAR, showing his salary was $55,356.81, along with an affidavit stating his gross income for 2022 would be the same amount. Julia also requested Peter's 2021 federal income tax return, which he provided and which indicated his adjusted gross income for 2021 was $861,382. Julia gave notice to the court that she intended to pursue the motion to modify child support, and she filed her reply to Peter's opposition to the motion. She stated that Peter's 2021 tax return demonstrated a material change of circumstances. Julia also stated that calculating child support under Rule 90.3 based on the income in Peter's 2021 tax return would result in a monthly payment of $1,224.35, which was more than a 15% change from the existing support order and therefore amounted to a change of circumstances.[7] She argued that if Peter chose not to realize all of this income, the court should impute that income to him.

The court held an evidentiary hearing at which Peter was the only witness. He testified that his primary source of income was his AAR salary and that his salary and time commitment fluctuated depending upon his role at the time. Peter testified that he had stepped down as AAR's general manager to work as fleet manager after his divorce because it provided more flexibility to spend time with their child.

Peter testified that despite the $861,382 listed as gross income on his W-2, he listed his $55,356.81 salary from AAR on his child support affidavit because it was "the only income I receive personally." He testified that the remaining income was from business activities and assets in the Cephas Trust, and because the trust is not a separate tax entity, the tax liabilities from those assets flow to his personal tax return but the income does not. He testified that he considered the businesses' income held by the trust "as separate and independent from me." And he testified that any residual money in the trust is reinvested in "business activities to grow . . . the financial health

---

[7] *See* Alaska R. Civ. P. 90.3(h)(1).

or strength of the business or pay off [business] debt," which he testified amounted to over $30 million.

Peter stated he established the trust after he and Julia divorced on the advice of his attorney and accountant before his second marriage, "to grow the businesses, employ[] more people, and to build a legacy" for their child, as well as to protect the assets in case that marriage "didn't work out."[8]  Peter testified that because his past child support obligation had been calculated based only on his W-2 wages, he did not believe that the income generated by his businesses had any bearing on his child support obligation.  He asserted that he was not trying to deprive their child of support when he transferred property into the trust.

Peter described the Cephas Trust.  The court interjected to ask about the trust's name.  "Cephas being Peter?  Is that right? . . . Cephas is the Bible name for Peter?"[9]  Peter acknowledged it was.  He stated that the trust is irrevocable, he has authority over its trust activities, and while he has a right to benefit from trust assets, he does not "try to take advantage of that right now."

Peter testified that he had selected an independent trustee for the trust. Peter stated that he chose a surveyor with whom he had worked in the past as the independent trustee, and that the trustee is the only one who decides whether distributions are made from the trust.  Peter testified that he had only asked for a distribution once, and the trustee had granted his request to cover the trust's tax liability. Peter acknowledged that distributions could be made to him at any time, but that any

---

[8]     Peter testified that his marriage to his second wife ended in divorce and that she received a settlement of $20,000 in cash, which he paid from a personal savings account.

[9]     *See John* 1:42 (English Standard Version) (" 'You are Simon the son of John.  You shall be called Cephas,' (which means Peter).").

distributions to other beneficiaries would require his permission. He testified the undistributed income remains in the trust.

Peter acknowledged that he is in control of the LLCs within the trust. He confirmed that the trust makes a profit from the rental income from one of the real estate LLCs and the businesses in the trust use properties controlled by other LLCs in the trust. He also testified that he lives rent-free in a home owned by his mother after paying $60,000 to renovate the house.

Because Peter's accountant was not available to testify, Peter's counsel made an offer of proof. She stated the accountant would have testified that because the trust is irrevocable, Peter, as the grantor, does not have the ability to revoke or amend it; that Peter is not entitled to the income that flows into the trust unless a distribution is approved by the independent trustee; and that the trust states the independent trustee cannot be Peter. Peter's attorney stated that the accountant would have explained the businesses were in trust to provide legal separation, and that placing the businesses in a trust would have protected them in the event of divorce. She said the accountant would have testified that this arrangement is not an uncommon strategy for his similarly situated clients in new marriages and that a purpose of the trust was to maximize Peter's income tax return.

The court made oral findings, first observing that the 2020 stipulation was made when the pandemic had "upended the business." It noted that it did not believe the stipulation, "which was entered . . . when the business was at risk, was intended to control child support for future years," observing that the risk came from the pandemic. The court noted that "Covid's over" and found that Peter had available assets that he had chosen not to withdraw.

The court found that Peter was not hiding money, but that he exercised considerable control over the trust. It explained that the money in the trust was "his money," that Peter could "get anything out of that trust he wants to," and that the trust document allowed Peter to take a distribution "anytime he wants to." The court also

found that because Peter controls selection of the independent trustee it "isn't very independent."

The court next found, based on the businesses' net profit of $861,000, that Peter's $55,000 annual salary was an artificial distribution. It determined Peter was taking an artificially low salary from successful businesses so money could be reinvested. It found Peter had a legal obligation to support his son "at a rate of income that truly reflects his resources" and concluded the appropriate amount should be calculated based on Rule 90.3's income cap of $126,000 "because it's clear he makes far more than that." The court observed that Peter "has access to a whole lot more money" but based on the evidence presented, it could not "determine precisely how much."

The court granted the motion to modify child support, adopting its oral findings and requiring Peter to pay $1,167.35 monthly. Peter appeals.

## III. STANDARD OF REVIEW

"Trial courts have broad discretion in deciding whether to modify child support orders."[10] "We review a trial court's determination of whether to modify child support for abuse of discretion."[11] "Whether an item qualifies as income for the purposes of Rule 90.3 is a question of law that we review de novo, adopting the rule that 'is most persuasive in light of precedent, reason and policy.' "[12] A trial court's decision to impute income is reviewed for abuse of discretion.[13] We review its factual

---

[10] *Wilhour v. Wilhour*, 308 P.3d 884, 887 (Alaska 2013).

[11] *Id.*

[12] *Fredrickson v. Button*, 426 P.3d 1047, 1052 (Alaska 2018) (quoting *Robinson v. Robinson*, 961 P.2d 1000, 1002 (Alaska 1998)).

[13] *Fredrickson*, 426 P.3d at 1052 (citing *Reilly v. Northrop*, 314 P.3d 1206, 1212 (Alaska 2013)).

findings, including findings regarding the amount of income to impute, for clear error.[14] "A finding is clearly erroneous if we are left with a definite and firm conviction that the trial court has made a mistake."[15]

## IV.  DISCUSSION

### A.  The Court Did Not Clearly Err By Finding A Material Change Of Circumstances.

Alaska Civil Rule 90.3(h)(1) allows for a child support award to be modified upon a showing of a material change of circumstances.  "A material change of circumstances can arise from 'certain fact changes occurring after the entry of a judgment' or from 'certain changes in the law.' "[16]  Under the rule, "[a] material change of circumstances will be presumed if support as calculated under this rule is more than 15 percent greater or less than the outstanding support order."[17]  The burden falls on the moving party to show by a preponderance of the evidence that there has been a material change.[18]

Peter argues Julia failed to demonstrate there was a material change of circumstances because she admits she was aware at the time of their stipulation that the businesses made "substantial revenues" and that his income was based only on his AAR salary as reflected on his W-2.  But Peter acquired new businesses and created the trust after the stipulation was adopted by the court, and as the court noted, "Covid's over."

---

[14]    *Reilly*, 314 P.3d at 1212.

[15]    *Fredrickson*, 426 P.3d at 1052 (internal quotations omitted) (quoting *Heustess v. Kelley-Heustess*, 259 P.3d 462, 468 (Alaska 2011)).

[16]    *Mitchell v. Mitchell*, 370 P.3d 1070, 1078 (Alaska 2016) (quoting *Bunn v. House*, 934 P.2d 753, 758 (Alaska 1997)).

[17]    Alaska R. Civ. P. 90.3(h)(1).

[18]    *See Ward v. Urling*, 167 P.3d 48, 53 (Alaska 2007).

In *Mitchell v. Mitchell*, we held that a father's withdrawal of funds from his retirement account constituted a material change of circumstances.[19] This was true even though the funds were withdrawn before the child support order was entered. Because the father did not include the withdrawal in his income estimate, the mother had no way to know the amount he withdrew until she received his tax return the following year.[20] The father asserted that the mother should have been barred from arguing for the withdrawal to be included in his income because she did not appeal the previous child support order, which the father claimed was a final judgment on that issue.[21] We disagreed and explained that "the appropriate framework for analyzing a motion to modify child support is not res judicata but rather the changed circumstances doctrine under Civil Rule 90.3."[22]

Unlike the father in *Mitchell*, Peter did not take distributions or withdraw funds.[23] But he acquired new property and placed it, along with AAR, into a trust that he created after the court approved and adopted the stipulation. Neither Julia, when she entered the stipulation, nor the court, when it calculated child support in April 2021 according to the stipulation's terms, could have considered assets whose existence had not been made known. Once Julia had reason to believe that Peter had more assets than the stipulation addressed, she filed a motion to modify the child support order that identified the reason: Peter did not qualify for the child tax credit.[24] Peter's tax return

---

[19]   *Mitchell*, 370 P.3d at 1078.

[20]   *Id.* at 1077-78.

[21]   *Id.* at 1077.

[22]   *Id.*

[23]   *See id.* at 1072, 1078.

[24]   INTERNAL REVENUE SERV., *supra* note 3.

provided in response to Julia's motion made clear, as in *Mitchell*, the value of the additional assets that were otherwise unknown.[25]

Peter's acquisition of new businesses and creation of the Cephas Trust significantly increased his available income. The creation of the trust alone marked a significant and material change in circumstances after the stipulation was entered. The superior court did not clearly err by finding a material change of circumstances.[26]

## B. The Court Did Not Abuse Its Discretion By Imputing Income To Peter.

Under Rule 90.3(a)(4), "[t]he court may calculate child support based on a determination of the potential income of a parent who voluntarily and unreasonably is unemployed or underemployed." "The court also may impute potential income for non-income or low income producing assets."[27] And a parent need not be unemployed or underemployed for potential income to be imputed for an underperforming asset.[28]

### 1. The superior court did not err by analogizing the trust to an underperforming asset.

Our case law treats imputed income from underemployment and from underperforming assets as separate calculations.[29] Courts are given broad discretion

---

[25]     *Mitchell*, 370 P.3d at 1075-78.

[26]     Peter also argues that the parties intended the 2020 stipulation to control all future child support calculations. However, despite the court's invitation to argue this point during the hearing, Peter did not raise it and thus failed to preserve it. *See Sea Lion Corp. v. Air Logistics of Alaska, Inc.*, 787 P.2d 109, 115 (Alaska 1990).

[27]     Alaska R. Civ. P. 90.3(a)(4)(D).

[28]     *Shepherd v. Haralovich*, 170 P.3d 643, 647 (Alaska 2007).

[29]     *Id.* (suggesting that Rule 90.3(a)(4)(D) indicates income from low or non-income producing assets is different than employment based income); *compare Ward v. Urling*, 167 P.3d 48, 55-57 (Alaska 2007) (declining to impute income for voluntarily unemployed parent), *and Sharpe v. Sharpe*, 366 P.3d 66, 69-73 (Alaska 2016) (imputing income where parent's decision to leave employment and move was unreasonable), *with Shepherd*, 170 P.3d at 647 (Alaska 2007) (imputing income where parent failed to reinvest property sale proceeds).

when imputing income based on the circumstances of the particular case.[30]  When imputing income for child support calculations, the court must ensure that the imputed income is a "realistic estimate of an obligor's adjusted annual income."[31]  When determining whether a parent is underemployed, the court considers the parent's particular circumstances including "work history, qualifications, and job opportunities."[32]  To determine whether a parent has underperforming assets, the court considers whether funds from the asset "would have been available for support if the family had remained intact" and whether the assets at issue were entered into or concealed by the obligor in order to reduce a child support obligation.[33]

The superior court did not clearly explain the basis for its decision to impute income.  It repeatedly mentioned Peter's "low" salary in relation to the trust's income.  And Peter's forgoing of available income within a trust that generates substantial income for him does not fit neatly under either heading — he is not underemployed and the trust is clearly not underperforming.

Peter argues the court must have found that he was underemployed because it found his wages were unreasonably low in relation to the trust's reported income.  And he argues it failed to address the factors required to impute income due

---

[30]     *Beaudoin v. Beaudoin*, 24 P.3d 523, 530-31 (Alaska 2001).

[31]     *Neilson v. Neilson*, 914 P.2d 1268, 1273 (Alaska 1996) (quoting *Zimin v. Zimin*, 837 P.2d 118, 123 (Alaska 1992)); *see also Beaudoin*, 24 P.3d at 530-31.

[32]     *Ward v. Urling*, 167 P.3d 48, 55 (Alaska 2007) (quoting Alaska R. Civ. P. 90.3 cmt. III.C.).

[33]     Alaska R. Civ. P. 90.3 cmt. III.A.; *see Ogard v. Ogard*, 808 P.2d 815, 819 n.6 (Alaska 1991) (noting courts may impute earnings in situations where parent reduced income by selling assets and applied proceeds to mortgage on his or her dwelling); *Laybourn v. Powell*, 55 P.3d 745, 747 (Alaska 2002) (imputing income for parent found to have purposely concealed assets and earnings).

to voluntary unemployment or underemployment.[34] Julia argues the Cephas Trust is an underperforming asset because Peter decided not to take advantage of the income generated by the businesses in the trust. She points to the court's finding that Peter had access to that income. Peter responds that the trust is not an underperforming asset because it generates substantial income.

In *Shepherd*, we held that a court could properly impute income to a mother who sold a rental property.[35] The mother netted over $95,000 in capital gains which was reflected by an increase in the amount she owed in federal income taxes.[36] But because she no longer received rental income from the property, the income she reported decreased by approximately $21,000.[37] As a result, the mother's child support obligation would have decreased as well.[38] But the superior court concluded that the mother "could have . . . safely reinvested" the proceeds from the sale of the property.[39] The court recognized that it was not improper for the mother to sell the property "to offset liabilities [which] would presumably improve the parent's financial situation," but concluded that it would be unreasonable to decrease her child support obligation based solely on the "loss" of an asset.[40] The court "only considered the net sale proceeds insofar as they could have been reinvested to provide a source of regular

---

[34]     *See Fredrickson v. Button*, 426 P.3d 1047, 1058 (Alaska 2018) ("[T]he superior court must find that the obligor is both voluntarily and unreasonably unemployed or underemployed. . . . [T]he superior court's method for calculating the obligor's actual earning capacity must be supported by adequate factual findings, based upon the obligor's work history, qualifications, and job opportunities.")

[35]     *Shepherd v. Haralovich*, 170 P.3d 643, 647 (Alaska 2007).

[36]     *Id.* at 649.

[37]     *Id.* at 644-46.

[38]     *See id.* at 644-45.

[39]     *Id.* at 646.

[40]     *Shepherd*, 170 P.3d at 648.

income," distinguishing this type of income from, for example, a one-time capital gain.[41]

Julia also analogizes to *Shepherd*.[42] She argues that Peter's actions were equivalent to the sale of a rental property. She asserts that placing profit-making entities into the trust and not taking the profits generated by those entities was the same as selling a rent-producing property, investing the proceeds, and asking that the money generated by the asset not be considered in calculating child support payments.

In *Ogard v. Ogard*, we observed that the superior court might have good cause to impute earnings "where an obligor parent has reduced his or her income by liquidating income-producing assets and applying the proceeds to the mortgage on his or her dwelling."[43] Peter did not sell assets, but he arranged to remove significant funds from his income, thereby removing them from consideration in calculating his support obligation. As we explained in *Shepherd*, "selling one investment to offset liabilities would presumably improve the parent's financial situation, and it is not obvious why it would be reasonable to decrease the parent's share of child support based on the 'loss' of the asset."[44]

Similarly, the superior court here focused on whether it was reasonable for Peter to forego significantly higher income and instead rely only on his reported salary from one of the businesses in the trust he controlled. The court concluded that

---

[41] *Id.* at 649. The court also noted that capital gains were not necessarily disallowed from being treated as income but they should be treated as income only "to the extent they represent a regular source of income." *Id.* at 645 n.1 (quoting Alaska R. Civ. P. 90.3 cmt. III.A.(16)).

[42] *Id.* at 645. We approved of imputation in this situation but remanded for recalculation with respect to certain tax liabilities. *Id.* at 647, 650.

[43] 808 P.2d 815, 819 n.6 (Alaska 1991).

[44] *Shepherd*, 170 P.3d at 648.

to accurately reflect Peter's "total income from all sources"[45] the trust income had to be considered. The commentary to Rule 90.3 supports the court's conclusion, indicating that an obligor's total income for purposes of calculating child support should include "benefits which would have been available for support if the family had remained intact."[46]

The court's factual findings appear to equate the trust with an underperforming asset. It questioned whether the owner of several successful businesses should have an income of only roughly $55,000 — coming entirely from his employment with only one of those businesses — when the businesses generated hundreds of thousands of dollars of income to which he was entitled. The court concluded that Peter's decision not to take distributions of that income made the trust constructively non-income producing.

In much the same way that the mother in *Shepherd* decided to forgo investment income from the sale of her property, Peter made a unilateral decision to forgo income from a potential income-producing asset.[47] Neither the mother in *Shepherd*'s forgone investment income nor Peter's forgone trust income are underperforming assets, but both artificially lowered the income on which child support obligations depended. And although the superior court recognized that Peter's reasons for building the trust's value were "all laudable goals," it was not reasonable for him to exclude the trust income from consideration of his child support obligation. Peter's decision decreased the funds available to support their child, and the court concluded that his treatment of the trust income was similar to an underperforming asset. Because the court imputed income on the basis of an underperforming asset, it did not err by

---

[45]     Alaska R. Civ. P. 90.3(a)(1).

[46]     Alaska R. Civ. P. 90.3 cmt. III.A.

[47]     *See Shepherd*, 170 P.3d at 645-48.

failing to make findings that would have been required to impute income for underemployment.[48]

> **2. The court did not clearly err by finding that Peter has control over the trust assets and the independent trustee.**

Peter argues the trust documents permitted but did not require the independent trustee to make distributions to him and there was no evidence that the independent trustee was easily influenced by him. Julia argues that it was up to the trial court to weigh the evidence, and the court "found Peter had control of the businesses in the [trust]. . . ."[49]

The superior court found:

> [T]he fact that he hasn't [requested a distribution from the trust] doesn't mean he can't do it. And if he does it, he's going to receive what he requests. Because he's the primary beneficiary, and he controls the assets. . . . [T]he trust may be the owner of the property, but he's in control of whether the assets that come into the trust come back out of the trust in terms of payments to him during his lifetime.
>
> . . . .
>
> And this trust document allows him to take a draw anytime he wants to. And he gets to control who the independent trustee is, which isn't very independent. So he has access to these funds, and he's choosing not to access those funds so that he can serve other personal interests. . . .

Peter has, as the investment trustee, "sole and absolute authority" over the investment of trust assets, permitting him to purchase and sell assets as he wishes. He also has a right to "benefit from the things in the trust."

---

**48**   *See id.* at 647 ("[I]t would not have been error to impute investment income to [the obligor] without first finding deliberate underemployment.").

**49**   *See Wasserman v. Bartholomew*, 38 P.3d 1162, 1166-67 (Alaska 2002) ("In a bench trial, the judge is the trier of fact, determining the credibility of witnesses and deciding how to weigh the evidence presented. Making a finding based on conflicting evidence is rarely clearly erroneous.").

The trust document states:

> The Independent Trustee may, but shall not be required to, distribute as much of the net income and/or principal of the Lifetime Trust as the Independent Trustee may at any time and from time to time determine, to such one or more of the Eligible Beneficiaries in such amounts or proportions as the Independent Trustee may from time to time select, for any purpose.[50]

No evidence was presented regarding any metric the independent trustee uses to determine whether to make a distribution. The trust document grants the independent trustee the authority to make distributions to Peter "for any purpose," and Peter received one distribution upon request in the past. Under the trust's terms, any net income not distributed is accumulated and annually added to the principal. Therefore, by declining to take distributions Peter is improving his own financial situation.[51] The court did not clearly err by finding Peter had control over both the trust

---

[50] The independent trustee must give Peter 30 days' notice before a distribution to eligible beneficiaries other than Peter and cannot make a distribution without Peter's agreement.

[51] Peter also argues the court erred by imputing income without considering whether his son's actual needs had materially changed, and he claimed the resulting modification would improperly elevate his son's lifestyle. He cited our discussion of commentary to Civil Rule 90.3 in *Sharpe v. Sharpe*, 366 P.3d 66, 71 (Alaska 2016), to show that imputing income to elevate a child's lifestyle is inappropriate, especially "when a parent's economic decisions are likely to significantly and ultimately benefit the child." But *Sharpe* actually refutes Peter's assertion, noting that "the 'relevant inquiry' when imputing income is 'whether a parent's current situation and earnings reflect a voluntary and unreasonable decision to earn less than the parent is capable of earning.' " *Sharpe*, 366 P.3d at 71 (quoting *Reilly v. Northrop*, 314 P.3d 1206, 1213 (Alaska 2013)). Our discussion in *Sharpe* is directed at career changes that result in reduced income that would lower the parent's child support obligation and "inevitably affect[] the child's well-being." *Id.* *Sharpe* therefore undermines Peter's position because he is not only "capable" of earning $800,000, he *is* earning $800,000. The court did not clearly err in its findings relating to the income Peter is capable of earning.

and the independent trustee and therefore had access to the funds despite choosing not to access them.

### 3. The court did not err by relying upon Peter's tax return to determine the amount of income generated by the trust.

Peter challenges the amount of income imputed to him, arguing that he had never made $126,000 in wages during the marriage and usually earned far less.[52] He argues the court simply imputed the income cap without any analysis beyond finding that the trust's earnings were substantial in 2021.

We have not previously considered a case in which a parent chose not to draw income from a business the parent owned in whole or in part. The superior court's discussion indicates that it, too, recognized the unusual circumstances of this case. The court's specific factual findings were somewhat limited, but it considered a number of factors before concluding that it was appropriate to calculate Peter's child support obligation based upon the maximum income level permitted by rule.[53]

Courts have broad discretion to impute income based on the factors described in Rule 90.3.[54] And commentary accompanying the rule states that a "parent's total income from all sources" should be interpreted broadly and includes

---

[52]    Julia asserts the opposite, arguing it was not unreasonable for the court to base its calculations on Peter's 2021 federal income tax return. She also notes that the trust was new and that Peter could have provided his 2022 tax returns at the evidentiary hearing but chose not to.

[53]    In his reply brief, Peter argued that the court overlooked mandatory factors, but these requirements appear only in the amended version of the rule which was not in effect at the time of the evidentiary hearing. *Compare* Alaska R. Civ. P. 90.3(a)(4)(B) (amended effective October 16, 2023), *with* former Alaska R. Civ. P. 90.3(a)(4) (2018).

[54]    *See Horne v. Touhakis*, 356 P.3d 280, 282 (Alaska 2015) ("Although 'courts [have] broad discretion to impute income based on realistic estimates of earning potential,' the court's imputed income determination must be based on the four factors listed in the rule:  the parent's work history, qualifications, job opportunities, and potential income from non-income or low-income producing assets.").

"income derived from self-employment and from businesses or partnerships."[55] The American Law Institute has noted that it is appropriate to impute an "ordinary rate of return to an asset that yields less than an ordinary rate of return."[56] Because the trust is made up of multiple businesses that are pass-through entities for tax purposes, imputing income from the businesses themselves was a reasonable approach.

Although we have not directly addressed how to treat undistributed earnings of a business that are attributable to a parent-shareholder for income tax purposes, courts in other jurisdictions have. These courts generally require a fact-specific inquiry into the availability of undistributed earnings to the parent-shareholder.[57] Relevant factors often include the parent-shareholder's access to and

---

[55] Alaska R. Civ. P. 90.3 cmt. III.A.; *see* Alaska R. Civ. P. 90.3(a)(1). The commentary also explains that "[i]ncome from self-employment, rent, royalties, or joint ownership of a partnership or closely held corporation includes the gross receipts minus the ordinary and necessary expenses required to produce the income." Alaska R. Civ. P. 90.3 cmt. III.B.

[56] AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF FAMILY DISSOLUTION: ANALYSIS AND RECOMMENDATIONS § 3.14 (2002).

[57] *See, e.g.*, *Zold v. Zold*, 911 So. 2d 1222, 1232-33 (Fla. 2005) (declining to set bright-line rule to determine whether undistributed pass-through income retained by S corporation should be considered available income for child support; factors to consider include extent shareholder has access to or control over undistributed, retained corporate income; purposes for which pass-through income retained by corporation; and extent of shareholder's interest in corporation); *Merrill v. Merrill*, 587 N.E.2d 188, 191 (Ind. App. 1992) (holding although sole stockholder-parent's choice to "roll over" profits into business may constitute sound business practice, its profits are income nonetheless); *In re Marriage of Brand*, 44 P.3d 321, 327-28 (Kan. 2002) (concluding relevant factors for determining whether to include distributions from S corporations as available income for purposes of calculating child support obligation include, inter alia, past earnings history of corporation and shareholder's ability to control distribution or retention of profits); *J.S. v. C.C.*, 912 N.E.2d 933, 942-43 (Mass. 2009) (requiring fact-based inquiry to determine whether and to what extent undistributed earnings of S corporation should be deemed available income to meet child support obligation;

control over the corporate income or distributions, the parent's interest in the corporation, the purposes for which the income is retained, and whether there is evidence of an attempt to shield the income.[58] When the parent is the sole shareholder, courts are likely to impute income, but "the portion of retained earnings attributable to the sole shareholder parent is a factual question."[59] The Massachusetts Supreme Judicial Court has distinguished between "[e]arnings retained in order to maintain the business as currently operated," which "should not be included in gross income," and "[e]arnings retained in order to expand the business," which "have the potential of increasing the business's value and thus the shareholder's personal net worth, and might properly be viewed as income available for child support — just as a distribution invested in another corporation would be."[60] Some courts shift the burden of proof depending on the shareholder's level of control over the corporation, presuming that a minority shareholder does not have access to retained income, while majority or sole

---

factors to consider include shareholder's level of control over corporate distributions (measured by ownership interest); legitimate business interests justifying retained corporate earnings; and affirmative evidence of attempt to shield income); *Bleth v. Bleth*, 607 N.W.2d 577, 579 (N.D. 2000) (holding corporation's income may be considered in determining obligor's earning capacity when obligor is sole stockholder of corporation and determines own salary); *Fennell v. Fennell*, 753 A.2d 866, 867, 869 (Pa. Super. 2000) (concluding income retained for investment not available for child support where minority shareholder lacked control over distributions).

[58]     *See Zold*, 911 So. 2d at 1232-33; *J.S.*, 912 N.E.2d at 942-43; *In re Brand*, 44 P.3d at 327. Where the parent is a minority shareholder and does not have control over distributions, many courts have declined to impute corporate income to them. *See Fennell*, 753 A.2d at 867, 869; *McHugh v. McHugh*, 702 So. 2d 639, 641-42 (Fla. 1997); *Mitts v. Mitts*, 39 S.W.3d 142, 148 (Tenn. App. 2000).

[59]     *In re Brand*, 44 P.3d at 327-28.

[60]     *J.S.*, 912 N.E.2d at 943 n.15; *cf. Merrill*, 587 N.E.2d at 191 (Indiana guidelines include retained earnings); *In re Brand*, 44 P.3d 327 (scrutiny warranted where payments on corporate debt increase personal net worth); *but see Fennell*, 753 A.2d at 867, 869 (income retained for investment not available for child support where minority shareholder lacked control over distributions).

shareholders are presumed to have access.[61]   Other courts place the burden on the shareholder to present evidence that they do not have access to the retained income regardless of their ownership percentage in the corporation.[62]

The superior court grappled with many of the factors other courts have identified, finding Peter had access to the trust's income and had control over how much money he receives.   The court noted he was not hiding money but that he was reinvesting the money in the businesses so he could pursue personal goals, which included funding charitable organizations[63] and providing for his son and other family members after his death.  Although he did not offer evidence of how income was being used to maintain the businesses versus expand them, Peter testified that one of the trust's purposes was to grow the businesses and that its residual income was used for that purpose.

In the absence of any more reliable evidence, it was reasonable for the court to rely on Peter's tax return to determine the amount of income generated by the trust.  The court found that he had access to "a whole lot more money" than his reported AAR salary.  And even though the court held that it was "clear he makes far more than [$126,000]," the court relied only on that cap to calculate his child support obligation.

### 4. The court did not abuse its discretion by choosing to impute an amount equal to Rule 90.3's cap for parental income.

The court based its child support obligation determination on Rule 90.3's income cap of $126,000, concluding that Peter earned an amount much greater than

---

[61]     *See, e.g.*, *In re Brand*, 44 P.3d at 327; *Fennell*, 753 A.2d at 869.

[62]     *See, e.g.*, *J.S.*, 912 N.E.2d at 943-44; *Zold*, 911 So. 2d at 1233; *Walker v. Grow*, 907 A.2d 255, 281 (Md. Spec. App. 2006); *Hubbard Cnty. Health & Hum. Servs. v. Zacher*, 742 N.W.2d 223, 228 (Minn. App. 2007).

[63]     For example, Peter pledged $200,000 to his church's building fund.

that.[64] The court also pointed out that much of the $861,382 on Peter's 2021 tax return is not captured by imputing the income cap of $126,000.

Rule 90.3 provides that the usual child support formula does not apply to a parent's adjusted annual income of over $126,000.[65] But the commentary indicates that the court may order an amount of child support above that limit if the other parent proves by a preponderance of the evidence that such an increase is justified.[66] Here it appears that the court could have chosen to impute more income to Peter than the Rule's cap of $126,000, considering the child's needs, standard of living, and "the extent to which that standard should reflect the supporting parent's ability to pay."[67] Neither the court's decision to impute income to Peter based on the income cap, nor its decision not to impute a larger amount of income than his wages alone, was an abuse of discretion.

Peter's child support obligation was $31.35 a month despite his control over assets in the Cephas Trust, which generate hundreds of thousands of dollars in income annually. The ultimate aim of child support orders is to meet the needs of the children who will benefit from the award, based on their parents' ability to pay it.[68] The superior court must ensure that this obligation, which is in the child's best interest, is enforced and it is granted broad discretion to do so.[69] The superior court did not abuse its discretion by imputing income to Peter.

## V.   CONCLUSION

We AFFIRM the superior court's order.

---

[64]   Alaska R. Civ. P. 90.3(c)(2).

[65]   Alaska R. Civ. P. 90.3 cmt. VI.D.

[66]   *Id.*

[67]   Alaska R. Civ. P. 90.3(c)(2).

[68]   Alaska R. Civ. P. 90.3 cmt. I.B.

[69]   *Fredrickson v. Button*, 426 P.3d 1047, 1055 (Alaska 2018).